THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* EDWARD
B. COOMBS, Appellant, Impleaded with GEORGE H. NASON.

*Presentation by two coroners of one fraudulent bill for inquests — when such presenta-*
*tion of the claim of both constitutes a single offense — sufficiency of the indictment —*
*competency of inquisitions in cases of fictitious inquests — private papers, how far*
*protected by the Bill of Rights and the Constitution — charge as to what constitutes*
*. an . inquest — circumstances under which the presentation of a false bill . is not*
*criminal — presentation of the bill to a deputy of the auditor.*

An indictment against two coroners of the county of Kings set forth the follow-
. ing bill of account, to wit:

· "THE CITY OF BROOKLYN, KINGS COUNTY,

" *To* EDWARD B. COOMBS and GEORGE H. NASON, Coroners of Kings Co,. *Dr.*
" July, 1897, for services in holding inquests.
"For month of July, 1897, 325 inquests, at $8.50.

Dollars. Cts. .

" Total dollars ........................................................... $2,762 50"
and further stated that attached to said bill, and as part thereof, were presented
two detailed statements or lists of the inquests held by such coroners, one
headed "Inquests held by Edward B. Coombs, coroner, for the month of July,
1897," under which, in detail, 162 inquests were stated; the other headed
"Inquests held by George H. Nason, coroner, for the month of July, 1897,"
under which, in detail, 163 inquests were stated. The indictment charged the
claim and account to have been false and fraudulent, and known so to be by
the defendants; that in fact in forty-two cases set forth in the list of inquests
stated to have been held by the defendant Coombs (specifying them) Coombs
did not hold any inquests, and that in seventy-eight of the inquests stated to
have been held by the defendant Nason (specifying them), Nason did not hold
any inquests.

*Held,* that the presentation of the bill, account or claim constituted but a single
offense;

That the indictment sufficiently averred the falsity of the items alleged to be :
fraudulent, although it did not specifically aver that the fictitious inquests in ·
the list of Coombs were not held by his co-defendant, or that those in the list
of Nason were not held by his co-defendant.

In such a case, to establish the falsity of the claim, it is competent to introduce
evidence that the signature of Coombs, one of the coroners, to the bill was his
genuine signature, although it appeared that the detailed statements of the
inquests alleged to have been held by him were not in his handwriting, and were
not annexed when he signed the bill, but were subsequently attached thereto
by his clerk, when such evidence is accompanied by proof that certificates filed
by such coroner, under his own signature, with the board of health, corresponded
with the detailed statements of inquests accompanying the bill, and there are
further offered in evidence certain papers purporting to be inquisitions, in the

cases of fictitious inquests, signed by Coombs after the bill had been presented, which warrant the conclusion that he must have known of the claim for the inquests represented by them; and when it is also shown, as to the alleged fictitious inquests, that no one of them was an inquest held with a jury; that no witnesses were sworn, and that in a great number of them the coroner was never present at all, and did not view the body.

In cases of fictitious inquests in the coroner's office, inquisitions which have never been filed by him are not to be considered as private papers, but even if so considered, they may be offered in evidence against him in a prosecution for a crime.

The Bill of Rights and the Federal Constitution draw no distinction between the papers of any citizen and his person, house and other effects, and the right guaranteed thereby is not against all searches and seizures, but against unreasonable ones. The citizen has no absolute right to the secrecy of his papers.

Under such circumstances a charge to the jury that "if the defendant (the coroner) went to a house and simply asked what a child died of and found out, and went back and made out his certificate, that is not an inquest in law, and he is not entitled to compensation for it. If the defendant went to a house where a child was dead, and did make a judicial inquiry into the cause of death, and he believed he had a right to do it alone, even though in law he had not a right to do so, then, so far as your investigation goes, you would be required to consider that as if he had a legal right to do it, but as to holding an inquest in the legal sense of the term without a jury, I charge you he cannot," is as favorable to the defendant as he is entitled to.

The preliminary investigation to determine whether there shall be an inquest does not itself constitute an inquest, and a resolution of the board of supervisors, passed in 1880, as follows: "*Resolved*, that the fees allowed to the coroners of Kings county after January 1st, 1881, be and hereby are fixed at the sum of eight dollars and a half ($8.50) for each inquest, including all charges and expenses," cannot be construed as covering the case of a preliminary inquiry of an entirely different character, subsequently authorized by law, the only investigation into the cause of death authorized at the time of the passage of the resolution being one instituted on the intervention of a jury.

*Semble*, that where a coroner believes that the preliminary investigations are inquests, or, whether they were inquests or not, that he is entitled to charge for them as such, and he has presented a bill embracing such charges, he is not guilty of the crime of presenting for audit a false and fraudulent bill.

*Semble*, that the presentation of a bill to a deputy of the auditor, through whom the bill finally reaches that officer, authorized to audit it, constitutes a presentation to the officer himself.

APPEAL by the defendant, Edward B. Coombs, from a judgment of the Supreme Court in favor of the plaintiff, bearing date the 21st day of March, 1898, and entered in the office of the clerk of the county of Kings, upon the verdict of a jury convicting him of the crime of fraudulently presenting to a public officer for audit a false

and fraudulent bill; and also from all intermediate orders in the said action, and from an order made at a term of the County Court of the county of Kings, bearing date the 9th day of January, 1898, and entered in the office of the clerk of the county of Kings, overruling the said defendant's demurrer to the indictment.

*Joseph A. Burr* [*Frederick E. Crane* with him on the brief], for the appellant.

*Josiah T. Marean,* for the respondent.

CULLEN, J.:

The appellant and George H. Nason, coroners of the county of Kings, were indicted for having presented a false and fraudulent claim against the city of Brooklyn for their services as coroners during the month of July, 1897, to John R. Sutton, the auditor of the city, for audit, allowance and payment. The bill or account is set forth in the indictment as follows:

" THE CITY OF BROOKLYN, KINGS COUNTY,

" *To* EDWARD B. COOMBS AND GEORGE H. NASON, Coroners of Kings Co., *Dr.*

" July, 1897, for services in holding inquests.

Dollars. Cts.

" For month of July, 1897, 325 inquests at $8.50......

" Total dollars......................................$2,762.50

" COUNTY OF KINGS, } *ss. :*
*City of Brooklyn,* }

" Edward B. Coombs and George H. Nason, being duly sworn, depose and say that the items charged in the within account, amounting to $2,762.50 are correct; that the services specified and articles enumerated therein have in fact been performed and furnished by due authority; also that the prices charged are reasonable and just, and that the said account has not been, either in whole or in part, paid, satisfied or assigned, and that the same is justly due to deponents.

" EDWARD B. COOMBS,

" GEO. H. NASON,

" *Coroners.*

" Sworn to before me }
August 3, 1897. }

" JACOB MASS,

" *Commissioner of Deeds.*"

The indictment charges that attached to said bill, and as part thereof, were presented two detailed statements or lists of the inquests held by the appellant and of those of his co-defendant. The caption of one list is : " Inquests held by Edward B. Coombs, Coroner, for the month of July, 1897." Then follow the number of the inquest, the name of the person on whose body it was held, and the date and place in the city where it was held. In this statement are detailed 162 inquests. The second statement is similar to the first, except that its caption is: " Inquests held by George H. Nason, Coroner, for the month of July, 1897." In this statement are detailed 163 other inquests. The indictment charges the claim and account as false and fraudulent, and known so to be by the defendants ; that in fact in forty-two cases set forth in the list of inquests as held by the defendant Coombs (specifying the cases), Coombs did not hold any inquest ; and that in seventy-eight of the inquests stated to have been held by the defendant Nason (specifying them), Nason did not hold any inquest. The indictment is of considerable length, and the foregoing reference to its contents is sufficient to apprise one of the general nature and character of the objections to its sufficiency raised by the appellant. The appellant demurred to the indictment on the grounds of insufficiency and duplicity. This demurrer was overruled, and afterwards the appellant was put separately on trial on the indictment. The jury found a verdict of guilty, and from the judgment pronounced on that conviction this appeal is taken.

On this appeal the appellant renews his attack on the indictment. The argument of the learned counsel for the appellant is substantially this : The claims of the coroners against the county for their respective services were several, not joint ; the account or claim set forth in the indictment, though in form a single claim, in reality constitutes two separate claims, one of the appellant for the inquests held by him, and the other of his co-defendant for the inquests held by him, and, therefore, if the bill was false in the respects charged in the indictment, two separate crimes were committed, one in presenting the false claim of the appellant, and another one in the presentation of the false claim of his co-defendant, and, hence, there was a misjoinder of offenses. The learned counsel further contends that if the bill is to be deemed a single joint claim

of both defendants for their services, then the indictment fails to charge a crime because it does not aver that the fictitious inquests in the appellant's list were not held by his co-defendant or that those in Nason's list were not held by the appellant; in other words, that it was not sufficient if the claim was joint to charge that one of the claimants had not rendered the services; that the indictment should have alleged that neither of them had rendered the service.

As to the first proposition, we are of opinion that the presentation of this bill, account or claim constituted but a single offense. It may very well be that, in law, the defendants had no joint claim against the city for their services, and that each was entitled to payment for the service he had personally rendered. It may also be that no joint suit by the two defendants against the city could be maintained. But the question is not how the claims of the coroners should have been presented, but how as matter of fact the claims were presented. The best test of the soundness of the appellant's contention is to take the case of Mass, the clerk who presented the bill of the defendants to the auditor. The evidence tends to show that Mass was not only cognizant of the fraudulent character of the bill presented by him, but also took the major part in the preparation of the claim. He might on the evidence in the record before us have been indicted as a participator in the crime. We do not see on what theory Mass could have been held guilty of two independent crimes in presenting this claim. Rightly or wrongly, he had presented but a single claim, and he could not be convicted of two offenses because instead of presenting one claim he should from a legal point of view have presented two.

We are thus brought to the second objection of the appellant, that if the indictment is for a single offense it does not sufficiently aver the falsity of the items alleged to be fraudulent, because it may be that while the appellant did not hold the forty-nine inquests, compensation for which was claimed, the other defendant may have done so. The indictment charges that the claims for these several inquests, forty-nine of the appellant and seventy-eight of his co-defendant, were false and fraudulent. It then specifically negatives the item of the claim as set forth in the bill. We think this was sufficient. It is true that if it appeared that Nason had held the alleged fictitious inquests charged as having been held by

Coombs, it would have rebutted the charge of fraud and entitled the appellant to an acquittal. But, in our opinion, it is not necessary that the indictment should negative every defense or exculpation of the crime. It was sufficient that it averred that the particular service charged for was not rendered by the person by whom the bill represented it to have been rendered, and the statement in the account that certain inquests were held by the appellant was an essential part of the description of the service.

The burden was on the People to affirmatively prove the false and fraudulent character of the bill. But "it is generally impossible to prove an absolute negative, and it is sufficient, therefore, for the prosecution to approximate, so far as is in its power, to such negative, leaving it to the defendant, if he can, to break this down by proving the affirmative fact." (Whart. Cr. Law, § 1165.) In Kings county the deaths number about 20,000 each year, and, of course, it was impossible to go through this list of deaths and prove that the appellant did not hold an inquest on the bodies of 162 of the persons so dying, or that both he and his co-defendant did not hold inquests on 325 deceased persons. It was sufficient to show that the claim and account of the appellant was false, so far as it was practicable so to do. The evidence adduced by the prosecution to establish the guilt of the appellant was of the following character : It was proved that the signature of the appellant to the bill was his genuine signature. But the proof showed that when the appellant signed the bill the detailed statements of the inquests held were not annexed, but were attached subsequently by Mass, the clerk. Neither of these statements is in the handwriting of the appellant, nor does his handwriting appear thereon. It was an essential part of the People's case to show the connection between these statements and the condensed bill, for the manner in which was proved the fraudulent character of the claim was by evidence that the specific inquests set forth in the statements were not held. It was, therefore, necessary to show that these tabulated statements were affixed to the bill by the authority of the appellant. Naturally enough, the prosecution was unable to prove this by direct evidence, Mass being beyond the jurisdiction of the court and implicated in the crime. But the prosecution was authorized to prove facts from which the jury might infer that the appellant intended Mass to attach the lists and present

the bill. It could show that there was a conspiracy between the defendants, Mass and the other employees of the office to present these fraudulent claims, and from the existence of such conspiracy the jury could find that the appellant counseled, advised and took part in the fraud. (*People* v. *McKane*, 143 N. Y. 455.) Mass was the clerk of the two defendants. He had presented all the bills of the defendants for audit during the period the defendants had been in office. Written on the condensed bill is the statement: "Inquisitions will accompany bill." Whenever the appellant held an inquest he filed at the time a certificate with the board of health of the city in the following form: .

"CORONER'S CERTIFICATE OF DEATH.

"This is to Certify, That I, Edward B. Coombs, Coroner in and for the County of Kings, have this, the 1st day of July, 1897, viewed the body of Francisco Gerazzo, who died at 209 Prospect Street, in the 5 Ward of the City of Brooklyn; that I have held an inquest upon the said body, and that the Verdict of the Jurors is that he came to his death by Marasmus on the 1st day of July 1897. Time till death.—— days, —— hours.

"1. Full name Francisco Gerazzo.

"2. Age —— years, 10 months, —— days.

"3. Sex — Male.   4. White.   5. Single.

"6. Birthplace, U. S.   7. Occupation.

"8. If of foreign birth how long in the U. S., —— years.

"9. How long resident in the City, —— years.

"10. Father's birthplace, Italy.   11. Mother's birthplace, Italy.

"12. Place of residence, 209 Prospect St., Brooklyn, Ward 5.

"13. Number of families in house ——.   14. On what floor.

"15. Place of inquest, 209 Prospect St.

"EDWARD COOMBS,

"*Coroner.*   [L. S.]"

Such certificates were filed in the case of every one of the inquests claimed to be fictitious. The detailed statements of inquests accompanying the bills correspond with the certificates previously filed by the appellant, under his own signature, with the board of health. In fact, it was necessary that they should correspond because the auditor verified the coroner's bills by examination of the certificates in the office of the board of health. There were also placed in evi-

dence what purported to be inquisitions in the cases of fictitious inquests. These inquisitions were produced from the coroner's office before the grand jury by Mass under a subpœna *duces tecum.* To the admission of these papers in evidence the appellant made an objection, which will be considered hereafter. These inquisitions all bear the genuine signature of the appellant as coroner in three places. The inquisitions are on partly-printed forms. In two of the places on the inquisition, where the appellant's name appears, the position is dictated by the printed form. The third instance in which the appellant's signature appears is at the end of the written testimony purporting to have been given. The testimony varies in length in the several cases, and, therefore, this signature is found in different positions on the blanks. From the evidence of the witness Deegan it appears that these inquisitions were signed by the appellant in the latter part of August, 1897, and after the bill had been presented. As to the forty-nine fictitious inquests, it was proved by members of the families of the deceased that in no one of them was an inquest with a jury held at all or a witness sworn. In a great number, if not a majority of the cases, it was proved that the appellant was never present at all and did not view the body. It was shown that in two or three cases, for some reason, the family was unable to obtain the certificate of the attending physician as to the cause of death; and that the undertaker and attendants went to the coroner's office and obtained a permit from the coroner for the burial. This was all the official action the appellant took in those cases. Proof was given as to the jurors who, from the records of inquisitions produced from the coroner's office, had apparently rendered a verdict on the cause of death, and subscribed their names to the verdict. Some few of these jurors seem to have been real persons. Such persons were produced, and testified that they never served as jurors in the cases. But the vast mass of them were fictitious. On inquiry at their alleged residences, where such residences could be found, it was discovered that no such persons lived there; and this was proved on the trial, either by actual residents on the premises, or by witnesses having the care and custody of the premises. In a great many instances the residences were wholly fictitious; that is to say, the place where the juror is stated to have lived was a vacant lot, or there was no such

number on the street. In fact, during the progress of the case for the prosecution, the fictitious character of these inquisitions became so apparent that the counsel for the appellant twice proclaimed in court that the defense would offer no evidence tending to contradict the proof that there was no jury. The matter was, however, put beyond dispute when the appellant went into his case. Deegan, a person already used as a witness for the prosecution, was recalled by the appellant as a witness on his behalf. The appellant proved by this witness that the witness had advised the appellant that in a case of sudden death, with no suspicious circumstances, it was unnecessary to have jurors. On cross-examination by the district attorney the witness testified that so far as the juries were concerned, every one of the inquisitions in controversy was false; that there were no juries summoned in the cases, and that the signatures of the jurors were written by the witness and another person. No evidence was given on the part of the appellant to contradict the evidence of the prosecution that in some of the cases he did not see the body, and was not present at all. We see nothing in the case of *The People* v. *McLaughlin* (150 N. Y. 365) to show that any of this evidence was not competent. Judge MARTIN, who wrote the opinion in that case, held that it was not competent to introduce evidence of other crimes than that charged in the indictment to establish a general criminal agency between the party committing the crime and the defendant on trial. As to that proposition, the majority of the Court of Appeals expressed no opinion. But no violation of the rule laid down by Judge MARTIN is found in the present case. No evidence was given of the commission of any other offense than that charged in the indictment. The evidence as to the connection between Mass, who presented the bill, and the appellant, was confined to the subject-matter of the charge. The relations of the parties in the case of a criminal conspiracy, or where the defendant is charged with having caused the commission of an offense by another, must always be relevant and competent. Except where one of the parties turns State's evidence, the existence of the conspiracy, or the responsibility of a defendant who did not physically take part in the offense itself, must generally be proved by circumstantial evidence.

At this point we shall consider the objection taken by the appel-

lant to the admission in evidence of the inquisitions in the cases of the fictitious inquests. These papers were in the coroner's office, and taken therefrom by the witness Mass under subpœna *duces tecum* to the grand jury, from which time they were retained by the district attorney. The learned counsel for the appellant contends that these were the appellant's private papers, never having been filed by him, and that, therefore, they could not be offered against him in a prosecution for a crime. The counsel bases his contention on the case of *Boyd* v. *United States* (116 U. S. 616). We are of opinion that these documents are not to be considered the private papers of the accused. But even were they his private property, that did not render them inadmissible in evidence. With the greatest deference to the Supreme Court, we are of opinion that, as pointed out in the opinion of Mr. Justice MILLER, the *Boyd* case did not present any question of seizure of papers under the 4th amendment to the Federal Constitution, but that of a violation of the 5th amendment, providing that no person shall be compelled in any criminal case to be a witness against himself. The law on this subject is not found in our State Constitution, but in the Bill of Rights, section 11 (1 R. S. 93). It may be that the 14th amendment to the Federal Constitution has made the provisions of the 4th and 5th amendments, which were originally passed only as limitations on the power of the general government, equally restrictions on the powers of the States. It is immaterial to examine this question, as the law upon the subject, whether constitutional or statutory, whether Federal or State, is substantially the same. The Bill of Rights and the Federal Constitution draw no distinction between the papers of any citizen and his person, house and other effects ; and the right guaranteed is not against all searches and seizures, but against unreasonable ones. The citizen has no absolute right to the secrecy of his papers. In civil actions it has been the immemorial custom to compel a person to present his books and papers to his adversary in order that there may be obtained therefrom the very evidence on which he is to be amerced in his property. A defendant in a criminal prosecution cannot be compelled to give such an inspection ; not because his papers are any more free from seizure than those of other citizens, but because under the Bill of Rights (§ 13) he cannot be "compelled in any

criminal case to be a witness against himself." (1 R. S. 94.) There-fore, a defendant in a criminal prosecution could not be compelled by by subpœnas *duces tecum* or other process to produce his papers for the purpose of incriminating him, nor could he be subjected to any examination to disclose their existence or place of deposit. But if the prosecution can obtain possession of the papers of a defendant without violation of the immunity guaranteed by the Bill of Rights, it is permitted to offer these papers in evidence against the defendant.

We think that the evidence already detailed clearly established the fact that the appellant contemplated that Mass should present the claim or account of the appellant for services as coroner for audit, and that he intended that Mass should annex thereto the detailed statements of the inquests held. The signing of these inquisitions by the appellant in August, though after the presenta-tion of the bill, warrants the conclusion that he must have been cognizant of the fact that the claim for the inquests represented by the inquisitions had been made. The appellant could not have signed them inadvertently or in ignorance of their contents, nor could he have signed them in blank, for, as already detailed, one of his signatures was placed immediately at the end of the written testimony. In fact, the evidence of the witness Deegan, when called for the appellant, substantially shows that these inquisitions had all been filled up when the appellant affixed his name thereto. When the evidence closed, there were practically only two questions in dispute, one of law, whether the appellant was justified in charging for an inquest where no jury had been called, and the second one of fact, whether even if wrong in his view of the law the appellant made the claim honestly and in good faith.

While, as already stated, the evidence as to many of the fictitious inquests tended to show that neither coroner nor jury had viewed the body of the deceased, or had been present at the place where the body was, still, as to others, it appeared that the coroner or his clerk had attended and made some inquiry of members of the family, or other persons present. The question of the appellant's guilt was submitted to the jury on all these inquests of both characters where the coroner attended and where he did not. The learned trial court charged on the question of his right to a fee as for an inquest when no jury was impaneled, as follows:

" An inquest, gentlemen, by a coroner, means, always has meant, a positive judicial investigation into the cause of death. It does not mean sending a clerk to ask the parents; it does not mean the coroner himself going to the house, asking a question, learning that the child died of cholera infantum, leaving the house after receiving that information and no more, and placing it in a certificate — that is not an inquest; the law never intended that as the judicial investigation which for a long time has been known as a coroner's inquest. If the coroner, when he hears that a person has died suddenly, or that he has died through some criminal agency, goes to the house and asks a parent, ' What did your child die of ?' and he is told, ' Of cholera infantum,' and goes away, the law does not recognize that as an inquest. Whether with or without a jury, an inquest means a judicial investigation into the cause of death."

At the close of the charge counsel for the appellant requested the court to further charge that the defendant was entitled to charge for each and every case in which he investigated the cause of death during the month of July, 1897, whether such investigation was made with or without a jury. In response to this request the court instructed the jury :

" Now, gentlemen, that question comes up expressly, and I will tell you what the law is on that. If the defendant went to a house and simply asked what a child died of and found out, and went back and made out his certificate, that is not an inquest in law, and he is not entitled to compensation for it. If the defendant went to a house where a child was dead, and did make a judicial inquiry into the cause of death and he believed he had a right to do it alone, even though in law he had not a right to do so, then, so far as your investigation goes, you would be required to consider that as if he had a legal right to do it, but as to holding an inquest in the legal sense of the term without a jury, I charge you he cannot."

To both the charge and the refusal to charge as requested, the appellant excepted. We think the instructions of the court to the jury on this question were at least as favorable to the defendant as he was entitled to. The coroner's inquest has from the earliest period in the history of our law been held with a jury. While in its broadest sense an inquest may include any judicial inquiry, its use is generally confined to an inquiry by jury. (2 Burr. L. Dict. 81;

Cent. Dict., word "Inquest.") Until the amendment of 1887 to section 773, Code of Criminal Procedure, it was the duty of a coroner whenever "informed that a person has been killed or dangerously wounded by another, or has suddenly died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by the act of another, by criminal means, or has committed suicide," to go to the place where the person was, inquire into the cause of death, and forthwith summon a jury. By the statute of that year the section was amended so as to direct the summoning of a jury if the death or wound be of a criminal nature. The amendment doubtless authorized an inquiry to some extent by the coroner into the circumstances of death before he determined to summon a jury; that is to say, that he should determine that the case was a reasonable one for holding an inquest before he should summon a jury. But this preliminary investigation to determine whether there should be an inquest does not constitute an inquest itself. The result of an inquest is a judicial determination of the manner in which the deceased came to his death; and if the death be occasioned by criminal means, who is guilty thereof. (§ 777, Code Crim. Proc.) We cannot see that the coroner, in his preliminary inquiry, makes any determination except whether an investigation shall be had. However, the question is not necessarily the legal interpretation of the term inquest, but in what sense that term was employed in the resolution of the board of supervisors fixing the compensation of the coroners, and what services the appellant intended to represent that he had performed when he stated in the bill that he had held inquests on the bodies of the persons named therein. The resolution of the board of supervisors was passed in 1880, and is as follows: "*Resolved,* that the fees allowed to the coroners of Kings county after January 1st, 1881, be and hereby are fixed at the sum of eight dollars and a half ($8.50) for each inquest, including all charges and expenses." At this time the only investigation into the cause of death was on the intervention of a jury, and the resolution cannot be construed as covering the case of a preliminary inquiry of an entirely different character subsequently authorized by law. The appellant may have been entitled to compensation for services for such inquiries, but he was not entitled to be paid the fees allowed him for an inquest.

Of course if the appellant in good faith believed that these investigations were inquests, or whether they were inquests or not that he was entitled to charge for them as such, he was not guilty of the crime charged. He had the right to present his claim against the city, even though ill-founded, if he truly stated the facts; or, rather, if he did not intentionally misstate the facts. The trial court gave the appellant the full benefit of this rule. It charged that the bill must not only be false and fraudulent, but must be presented by the defendant with the intention to defraud the city; that before the jury could convict the defendant, it must be established that he knew the contents of the bill, and knew that it was false. The evidence was ample to warrant the jury in finding that the appellant knew the character of the claim. In all the cases of these fictitious inquests, the certificate filed by the appellant with the board of health stated that there had been a verdict of the jury, and what that verdict was, when concededly there was no verdict in these cases. The preparation and certification of the pretended inquisitions in the cases of these inquests, representing the attendance of jurors and purporting to bear their signatures, equally establish the knowledge of the appellant as to the character of the claim he presented. If the claim was made in good faith, why state falsehoods concerning it, or manufacture fraudulent inquisitions to cover up the falsehoods previously told? In our opinion the evidence fully warranted the verdict of the jury; indeed, we do not see how a conscientious jury could have rendered any different verdict.

There are two further objections to the regularity of the trial, which require to be noticed. It is contended that there was a fatal variance between the indictment and the proof, in that the former charged that the claim was presented to John R. Sutton, the auditor of the city, while the proof tended to show that the claim was submitted for action to Albert A. Leech, the second deputy auditor. As a matter of fact it was presented directly to neither of them, but to Frederick W. Linker, an inspector in the auditor's office. He examined the bill and statement, and compared it with the records in the office of the board of health. Having thus verified the bill, he presented it to the second deputy, Leech, who audited it, the auditor being absent from the city at the time. The offense of the

appellant, if offense there was, was complete at the time the bill was presented for audit, and the subsequent audit or refusal to audit was immaterial. That a presentation to a clerk or subordinate of the auditor, through whom the bill would finally reach the officer authorized to audit, was a presentation to the officer himself, is not disputed. I should be inclined to the opinion that in case of a public officer authorized to audit, having deputies empowered to act in his place, a presentation of the bill to the deputy would be properly charged as a presentation to the officer himself. However this may be, under section 293, Code of Criminal Procedure, the variance could have been cured by an amendment to the indictment. While no amendment of the indictment was made, still under section 542 it is the duty of the appellate court to give judgment, without regard to technical errors or defects not affecting the substantial rights of the parties. As the error could have been cured by an amendment to the indictment, a failure to make which amendment has in no manner prejudiced the appellant, we think no effect should be given to it.

The claim which is the subject of this indictment was paid by a city warrant. It was received by Mass and by him deposited in the Manufacturers' Trust Company, one-half to the credit of the appellant and the other half to the credit of his co-defendant. It was sought to prove that the appellant had received the proceeds of his half by checking them out from his bank deposit. The original checks had been returned to the appellant, so they could not be produced. But the fact was sought to be established by the books of the bank, and for this purpose a transcript of the appellant's account in the bank ledger was admitted in evidence. We concede that the books of the bank are not themselves competent evidence against its dealers, but they could be made so by other proof. If the book of original entry of the appellant's checks had been produced, and the clerk or teller who paid the checks and made the entries of their payment had testified to the truth of such entries, the book would have been competent evidence. This proof was not given, and the ledger account should not have been admitted had proper objection been made. We doubt very much whether the objection taken by the appellant was sufficient. But assuming that the admission of this account was error, we cannot see that it in any way prejudiced

or harmed the appellant. Concededly the appellant and his co-defendant presented a claim for 325 inquests. The offense, as already stated, was complete when the bill was presented for payment; and it was not necessary to show the fact that it was paid to establish the appellant's guilt. The amount paid by the city was the proper compensation for 325 inquests. When the defendants presented the bill for that number of inquests they undoubtedly expected to receive the sum paid. There was no issue before the jury as to the amount the appellant collected from the city, or endeavored to collect; but the question was whether he was entitled to receive the money he unquestionably sought to obtain. We cannot see how the admission of this evidence can have in any way prejudiced the appellant on that issue.

We are not sure that we understand the point of the counsel for appellant in his objection that the testimony of the expert that the signatures of jurors to the pretended inquisitions was incompetent. The People did not attempt to prove in whose handwriting these signatures were. All that they endeavored to show was that the signatures, purporting on their faces to be those of different persons, were in fact the same handwriting. We cannot see how familiarity with the handwriting of any of the supposed jurors was necessary to enable the expert to testify on that question. The face of the signatures themselves was all that was requisite. The jury might have made the comparison and drawn their own deduction therefrom. The expert was at liberty to testify to his deduction from the same data.

We find no error that requires us to reverse this judgment. The judgment appealed from should, therefore, be affirmed.

All concurred.

Judgment affirmed.