### In re FOSTER.

#### FOSTER v. KENNY.

(Supreme Court, Appellate Division, Second Department. July 29, 1910.)

1. RECEIVERS (§ 112*)—POWERS—INSPECTION OF PAPERS—SUBPŒNA DUCES TECUM.

Where a receiver of partnership property was appointed, and the parties were ordered to deliver to him all the partnership books, etc., which were to be open to the inspection of the parties and their attorneys and accountants only, and a paper purporting to be a subpœna duces tecum was served upon the receiver requiring him to appear before the commissioner of accounts and produce all of the books, etc., an order to show cause, directed to the parties, why the order directing the parties to deliver the books, etc., to the receiver should not be amended to permit him to obey the subpœna, was improperly made, since he had no standing in the action to apply for such relief, he not being a party and not standing in the shoes of the copartners, and, though he could apply to the court for instructions as to whether he should obey the subpœna, he could not seek a modification of the order which did not concern him.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 199; Dec. Dig. § 112.*]

2. WITNESSES (§ 16*)—SUBPŒNA DUCES TECUM.

Laws 1897, c. 378, as amended by Laws 1901, c. 466, § 119, empowers the mayor to appoint two commissioners of accounts, who shall make examinations of the accounts of the departments and offices of the city, and to report to the mayor the results thereof and authorize them to compel the attendance of witnesses. Code Civ. Proc. § 854, provides that, when a judge is authorized to do any act in relation to which proof must be taken or the attendance of a witness is required, a subpœna may be issued requiring the person to attend and in proper case to bring with him a book or paper. *Held*, that the two sections must be read together, so that a subpœna duces tecum may issue only "in a proper case."

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 19–27; Dec. Dig. § 16.*]

3. CONSTITUTIONAL LAW (§ 309*)—"DUE PROCESS OF LAW"—"PROPER CASE."

To constitute due "process of law" within the federal Constitution and a "proper case" within Code Civ. Proc. § 854, providing for the issuance of a subpœna duces tecum "in a proper case," it must appear that the books and papers sought for have some materiality or relevancy to the matter under consideration, since no inquisitorial officer should be permitted, of his own volition, and arbitrarily, to compel a person to produce books and papers of a private and confidential character.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 929, 930; Dec. Dig. § 309.*

For other definitions, see Words and Phrases, vol. 3, pp. 2227–2256; vol. 8, p. 7644; vol. 6, p. 5689.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. PARTNERSHIP (§ 149*)—SUBPŒNA DUCES TECUM—RIGHT TO QUESTION VA-
LIDITY OF.

As members of a firm do not hold the firm assets as tenants in common,
the fact that a firm's papers are in possession of a receiver, or that the
papers relate to partnership business, and that a partner consents to their
inspection, does not prevent a copartner from attacking the validity of a
subpœna duces tecum.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 240; Dec.
Dig. § 149.*]

5. WITNESSES (§ 16*)—SUBPŒNA DUCES TECUM—APPLICATION TO SET ASIDE.

A party whose rights are invaded by a subpœna duces tecum may apply
to the court whose duty it is to enforce it to set aside such process if it
is invalid.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 19–27; Dec.
Dig. § 16.*]

Appeal from Special Term, Kings County.

In the matter of the application of William Foster to cancel and
set aside a subpœna duces tecum issued by the Commissioner of Ac-
counts. From an order setting aside the subpœna (123 N. Y. Supp.
465), the Commissioner appeals. Affirmed.

See, also, 124 N. Y. Supp. 675.

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR,
THOMAS, and RICH, JJ.

Edward M. Grout (Dean Potter, on the brief), for plaintiff Foster.
Terence Farley (Francis Martin, on the brief), for Commissioner of
Accounts of City of New York.

BURR, J. Prior to January 23, 1909, William George Foster and
William J. K. Kenny were copartners, doing business under the firm
name of William George Foster. On that date the firm was dissolved.
On February 10, 1909, in an action brought in the Supreme Court in
Kings County for a settlement of the partnership accounts, Hamilton
Holt was appointed receiver of the copartnership property during the
pendency of said action, and the parties thereto were directed to
deliver to him "all partnership books, books of account, journals,
ledgers, checkbooks, papers and other effects." The order provided
that the said receiver should hold these "open to the inspection of the
parties hereto, their attorneys and accountants, at all reasonable times,
but not to any other person without the further instruction of this
court, given upon notice to the parties hereto." On the 1st day of
June, 1910, a paper purporting to be a subpœna duces tecum, issued
by Raymond B. Fosdick, commissioner of accounts of the city of New
York, was served upon Holt. By its terms he was required to attend
before the said commissioner on the 3d day of June, to be examined
under oath, and to bring with him and produce at the time and place
aforesaid all canceled checks and vouchers and all check stubs of said
firm held by him as such receiver, and all other books, deeds, evi-
dences, and writings which he had in his custody and power. On the
2d day of June the receiver obtained an order to show cause directed
to the parties to said action why the order of February 10, 1909, above
referred to, should not be amended so as to permit him to obey the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

said subpœna. Thereafter, on the motion of said receiver and against the opposition of William G. Foster, an order was made in said entitled action, modifying said order so that it read as follows:

"Ordered that the order of Mr. Justice Thomas in the action of William George Foster against William J. K. Kenny, entered in the office of the clerk of this court on the 10th day of February, 1909, be and the same hereby is modified to the extent of allowing the said receiver to comply with any order or direction of this court or any justice thereof without any further notice to the parties except that a copy of said order or direction must not only be served on the receiver, Hamilton Holt, but also on William G. Foster or his attorney, Edward M. Grout, at least 48 hours before the return day or the date it is to take effect."

From this order Foster appeals.

Without determining its precise effect, we have no doubt that the order was improperly made, for the reason that the receiver had no standing in said action to apply for the relief granted. He is not a party to it, nor does he stand in the shoes of the copartners who are the sole parties thereto. Bogert v. Turner, 135 App. Div. 530, 120 N. Y. Supp. 420. He was a mere chancery, or, as it is sometimes called, a common-law receiver, as distinguished from a statutory one. Stokes v. Hoffman House, 167 N. Y. 554, 60 N. E. 667, 53 L. R. A. 870; Brooklyn Improvement Co. v. Lewis, 136 App. Div. 861, 122 N. Y. Supp. 111. Doubtless he was entitled to apply to the court for instructions as to whether he should obey the subpœna served upon him. But it was no part of his duty to interfere in an action to which he was not a party, and seek a modification of the court's order in respect to a matter which did not concern him in the least. So much of the order of June 20, 1910, as grants this relief must be reversed.

At the same time that the receiver moved in the action of Foster v. Kenny to modify the order appointing him, Foster applied to the same court for an order vacating the subpœna duces tecum served upon the receiver, which motion was granted, and from the order entered in accordance with such decision the commissioner of accounts brings an appeal. Several objections based upon the form of the subpœna and the regularity of the proceedings connected with the issue thereof have been urged upon us. It may be that, as the order modifying the order of February 10, 1909, has been reversed, the subpœna issued by the commissioner of accounts is powerless, and that the receiver, the witness, is forbidden by the terms of that order from obeying it. We do not propose to consider or determine these questions. We think that the situation is one which calls for treatment upon broader grounds. We propose to consider first whether the statute under which the commissioner assumes to act authorizes him to compel the production before him, as this subpœna assumes to do, of all the private books and papers of an individual, irrespective of their relation to transactions with any official or employé of the city or any of the departments thereof; and, second, whether the validity of said subpœna may be attacked in the manner here adopted.

In determining the scope of a statute, a study of its history is often of assistance. In 1873 an act was passed entitled "An act to reorganize the local government of the city of New York" (Laws 1873,

c. 335, § 106). This provided for the appointment of commissioners of accounts. Their duties were twofold: First, to examine all vouchers and accounts in the offices of the comptroller and the chamberlain; and, second, to make an examination of the expenses of the several departments and offices of the city government. The purpose of the former examination was to enable them to make and publish "a detailed statement of the financial condition of the city," and of the latter to enable them to make recommendations to the board of aldermen and other officers, particularly with reference to salaries and duties. This act was re-enacted verbatim in the consolidation act (Laws 1882, c. 410, § 110). In 1884 this section of the consolidation act was amended (Laws 1884, c. 516). As amended it ̍read as follows:

"The mayor shall appoint and remove at pleasure two persons who shall be commissioners of accounts. It shall be their duty, once in three months, to make an examination of the receipts and disbursements in the offices of the comptroller and chamberlain, in connection with those of all the departments and offices making returns thereto, and report to the mayor a detailed and classified statement of the financial condition of the city as shown by such examinations. They shall also make such special examinations of the accounts and methods of the departments and offices of the city and county government as the mayor may from time to time direct, and report to the mayor the results thereof, and such other examinations as the said commissioners may deem for the best interests of the city and county. For the purpose of ascertaining facts in connection with these examinations they shall have full power to compel the attendance of witnesses, to administer oaths and to examine such persons as they may deem necessary."

Without substantial change as to scope and the power of the commissioners, this statute was re-enacted in the charter of the Greater New York (Laws 1897, c. 378), and also in the revised charter (Laws 1901, c. 466, § 119). By the amendment above referred to the powers of the commissioners were greatly enlarged. While in the first instance their duties were largely advisory, and their powers limited in extent to an examination of what appeared in the public offices, the manifest purpose of the amendment was to give them powers of investigation outside of those things which were matters of record therein. As amended, the purpose of the act was to enable the commissioners of accounts to investigate not only into the accuracy of the bookkeeping in the various offices and departments of the city government, but also by the examination of witnesses to ascertain the fairness and honesty of the transactions therein recorded. Matter of Hertle (Ahearn) 120 App. Div. 717, 105 N. Y. Supp. 765, affirmed 190 N. Y. 531, 83 N. E. 1126. But while this may be so, the commissioners must proceed according to legal methods, and the individual rights and constitutional privileges of the citizen must not be subverted. The charter itself prescribes no method by ̍which the attendance of witnesses can be secured. Standing alone, it may be doubted whether its provisions would be enforceable. The learned corporation counsel contends that the provisions of this section of the charter must be read in connection with section 854 of the Code of Civil Procedure. Its relevant provisions are as follows:

"When a judge, * * * or other person, * * * has been heretofore or is hereafter expressly authorized by law * * * to do any * * *

act in an official capacity, in relation to which proof may be taken, or the attendance of a person as a witness may be required, \* \* \* a subpœna may be issued by and under the hand of the \* \* \* other person, \* \* \* requiring the person to attend; and also, in a proper case, to bring with him a book or a paper. \* \* \* This section does not apply to a matter arising, or an act to be done, in an action in a court of record."

That they should be read together was decided in Re McAdam (Sup.) 5 N. Y. Supp. 387, affirmed 54 Hun, 637, 7 N. Y. Supp. 454. We think, therefore, that under these sections, in a proper case, a subpœna duces tecum may issue. But do the words "in a proper case" contemplate such a subpœna as was here issued?

Of a similar character to the right belonging to the individual to require due process of law before he is deprived of life, liberty, and property, to the right in a criminal case to stand mute and not be a witness against himself, is his right to be secured in his person, houses, papers, and effects, against unreasonable searches and seizures. This right may not be wholly secured by the constitutional provisions respecting due process of law, or that he shall not be compelled in a criminal case to be a witness against himself. On oral examination he may object if the question addressed to him violates his natural or constitutional right, and he may then plead the protection secured to him. The testimony of a written instrument is given as soon as the eye falls upon it, and the mind thereby becomes possessed of its contents. For this reason the federal Constitution by a separate provision seeks to secure protection to the citizen against infringement of this right. Const. U. S. Amend. 4. The scope of this provision has been many times considered. As was said by Mr. Justice McKenna in Hale v. Henkel, 201 U. S., on page 83, 26 Sup. Ct. 382, 50 L. Ed. 652, the fourth and fifth amendments to the federal Constitution, the former relating to the unreasonable seizure of papers and the latter to compelling a person in a criminal case to be a witness against himself, "are the complements of each other, directed against the different ways by which a man's immunity from giving evidence against himself may be violated." The high character of this right was early recognized in England, and in 1765, in the famous case of Entick v. Carrington, 19 Howell's State Trials, 1030, Lord Chief Justice Camden said:

"Papers are the owner's goods and chattels. They are his dearest property, and are so far from enduring a seizure that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and therefore it is too much for us without such authority to pronounce a practice legal, which would be subversive of all the comforts of society."

It is worthy of notice that, immediately following the delivery of this opinion, the House of Commons adopted a resolution expressly declaring the seizure of private papers in case of a criminal libel (it was a case of such character that Lord Camden was considering) to be illegal. See 19 Howell's State Trials, 1074.

In Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed.

746, Mr. Justice Bradley, speaking of the provisions of the federal Constitution, said:

"Any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

In Interstate Commerce Comm. v. Brimson, 154 U. S. 447, 155 U. S. 3, 14 Sup. Ct. 1125, 15 Sup. Ct. 19, 38 L. Ed. 1047, the court say:

"The principles that embody the essence of constitutional liberty and security forbid all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of his life."

And quote with approval the language of Mr. Justice Field in Matter of Pacific Railway Commission (C. C.) 32 Fed. 241, where he says:

"Of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, but exemption of his private affairs, books, and papers from the inspection and scrutiny of others. Without the enjoyment of this right, all others would lose half their value."

We are aware that it seems still to be an open question in the United States Supreme Court whether the fourteenth amendment to the Constitution of the United States made the fourth and fifth amendments thereof privileges and immunities of the citizens of the United States of which they may not be deprived by the action of the states. Adams v. New York, 192 U. S. 585, 24 Sup. Ct. 372, 48 L. Ed. 575; Consolidated Rendering Co. v. Vermont, 207 U. S. 541, 553, 28 Sup. Ct. 178, 52 L. Ed. 327. In view of its hesitation, it becomes us to be diffident. If the provisions of the Constitution are applicable, we have no hesitation in saying that, if the statute is capable of such construction as would warrant such seizure, then the statute is void for conflict therewith. Although our state Constitution contains no precisely similar provision, the same principle is embodied in our civil rights law. 1 Consol. Laws (Birdseye's C. & G.'s Ed.) p. 619, § 8. It is quite true that the Constitution and the statute both relate only to unreasonable search and seizure, and the distinction between that which is reasonable and unreasonable is suggested by Mr. Justice Cullen in People v. Coombs, 36 App. Div. 284, 293, 55 N. Y. Supp. 276, affirmed in 158 N. Y. 532, 53 N. E. 527. In Matter of Davies, 168 N. Y. 89, 105, 61 N. E. 118, 56 L. R. A. 855, our Court of Appeals, referring to the provisions of our state Constitution respecting personal rights (Const. art. 1, § 6), say:

"The word 'liberty,' as thus used, has a broad meaning. It includes liberty of action, which is interfered with by a command to lay aside all business and excuses and appear at a designated place and give testimony. It embraces the right to keep secret one's books and papers, his business methods and his knowledge of his own affairs. Yet these constitutional rights may all be interfered with by due process of law when the general good requires it."

But the spirit of the provision of the federal Constitution (and that of the statute must be the same) has been well expressed in the cases

above cited. If, then, the federal Constitution has no application, in view of the history of the struggle for personal liberty in the mother country and here, in view of the clear and forcible provisions of the civil rights law of this state above referred to, so consonant with every principle thereof, in view of the great care with which the Legislature has circumscribed even the power of the Supreme Court in compelling discovery, we should hesitate to hold that by this charter provision it was the intention of the Legislature to repeal by implication the beneficent provisions of this statute against unreasonable search and seizure, and to confer upon the commissioners of accounts of the city of New York a power far in excess of that conferred upon any tribunal or official—a power so extreme as to be despotic in its character. The extreme care manifested in the language of the inter-. state commerce act (Act Cong. Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, pp. 3154–3177]), the anti-monopoly act of this state (2 Consol. Laws [Birdseye's Cummings & Gilbert's Ed. 1876] §§ 340– 346), and the procedure prescribed for taking depositions within this state to be used in another state (Code Civ. Proc. §§ 914, 915; Rule 17, General Rules of Practice)—all calculated to protect the right of the citizen against unlawful interference with his private books and papers, are strong arguments against the intent of the Legislature to confer upon the commissioners of accounts of the city of New York such absolute power. Not only do we think that there was no intent to repeal the civil rights law, and to confer upon the said officials such despotic power, but the words of the charter, read in connection with the provisions of the Code of Civil Procedure, indicate just the contrary. The words of the section relied upon are "in a proper case the production of a book or paper may be compelled." Code Civ. Proc. § 854.

To constitute "due process of law" and "a proper case," it must somewhere and at some time be made to appear that the books and papers sought for have some materiality or relevancy to the matter lawfully under consideration. No inquisitorial officer should be permitted, of his own volition, arbitrarily and without any check or safeguards upon the rights of the citizen, to compel him to produce and submit to his scrutinizing gaze all his books and papers of the most private and confidential character. But who is to determine what is "a proper case"? Was it intended that the commissioners should exercise this function, judicial in character? But it was held in the Ahearn Case, supra, that the commissioners of accounts possessed no judicial powers. Inasmuch as all proceedings to make the commissioner's subpœna effective confessedly must be taken under the Code provisions or not at all, it may be that the judge to whom application is made to enforce obedience to it (Code Civ. Proc. §§ 855, 856) may be called upon to decide respecting the same. If not, then the provisions of section 119 of the Greater New York Charter (Laws 1901, c. 466) and the provisions of section 854 of the Code of Civil Procedure, so far as they relate to the power of the commissioners of accounts, are unenforceable at the present time.

In opposition to the motion to set aside this subpœna, the learned corporation counsel introduced affidavits from which he asked the

court to determine that the examination sought was not an unreasonable one. If the court has power to pass upon the question at this time, it is our opinion that not the slightest justification is shown for the extraordinary demand of the commissioner of accounts as expressed in the subpœna issued by him. It is no answer to say that a subpœna duces tecum does not partake of the character of a search or seizure. In Hale v. Henkel, 201 U. S. 43, 76, 77, 26 Sup. Ct. 370, 379, 380, 50 L. Ed. 652, the court, in condemning the practice of issuing a general subpœna duces tecum to produce all the contracts, books, and papers of a firm, said:

"An order for the production of books and papers may constitute an unreasonable search and seizure within the fourth amendment. * * * Some necessity should be shown, * * * or some evidence of their materiality produced, to justify an order for the production of such a mass of papers. A general subpœna of this description is equally indefensible as a search warrant would be if couched in similar terms."

Nor is it any answer to say that this examination is not sought in any criminal proceedings. In the absence of a full and complete statute of indemnity, a person should not be compelled, when acting as a witness in any investigation, to give evidence which may tend to imperil his constitutional privilege. Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110. Quoting again from the opinion of Mr. Justice Field (Matter of Pacific Railway Commission, supra), he says:

"The language thus used had reference, it is true, to the compulsory production of papers as a foundation for criminal proceedings; but it is applicable to any such production of the private books and papers of a party otherwise than in the course of judicial proceedings, or a direct suit for that purpose. It is the forcible intrusion into, and compulsory exposure of, one's private affairs, and papers, without judicial process, or in the course of judicial proceedings, which is contrary to the principles of a free government, and is abhorrent to the instincts of Englishmen and Americans. * * * Compulsory process to produce such papers, not in a judicial proceeding, but before a commissioner of inquiry, is as subversive of 'all the comforts of society' as their seizure under the general warrant condemned in that case."

Our conclusion, therefore, is that the statute does not warrant the commissioner of accounts in issuing the subpœna duces tecum, the validity of which is attacked in this case, and to sustain such exercise of power upon his part would be subversive of every well-established principle of personal liberty intended to be secured to the citizens of this state and country.

It only remains to consider whether the validity of this subpœna may be attacked by Foster, and in this proceeding. The fact that the papers are temporarily in the custody of the receiver of the firm does not affect his right. They are still his papers, and he is entitled to guard and protect them from improper attack. Nor does the fact that the papers relate to copartnership transactions, and that Foster's copartner consents to their inspection, militate against his right. Members of a firm do not hold the firm assets as tenants in common. "The corpus of the effects is joint property, and neither partner separately has anything in that corpus." Menagh v. Whitwell, 52 N. Y. 146, 11 Am. Rep. 683.

A more troublesome question arises as to the regularity of the practice adopted by Foster in making the motion to set aside the subpœna. The practice usually followed in such cases seems to have been to disobey the subpœna and await the institution of proceedings to punish for contempt. But in this case the witness subpœnaed is Holt, while the real party to the proceeding is not the witness Holt, but Foster, whose rights are being invaded. In view of the fact that if a subpœna is ever to become effective it is by virtue of the provisions of the Code of Civil Procedure, which contemplated a judicial proceeding to punish for contempt if it was disobeyed, we think that a party whose rights are invaded by such process may apply to the court whose duty it is to enforce it, to set aside such process if it is invalid. The regularity of such procedure seems to be suggested, although not necessarily involved in the determination of the cases of Matter of Dittman, 65 App. Div. 343, on page 346, 72 N. Y. Supp. 886, and Matter of Randall, 90 App. Div. 192, 194, 85 N. Y. Supp. 1089.

The order of the Supreme Court setting aside the subpœna issued by the commissioner of accounts should be affirmed.

Order setting aside subpœna duces tecum affirmed, with $10 costs and disbursements. All concur.

---

### FOSTER v. KENNY.

(Supreme Court, Appellate Division, Second Department. July 29, 1910.)

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR, THOMAS, and RICH, JJ.

PER CURIAM. Order in so far as appealed from reversed, with $10 costs and disbursements, and motion denied, with costs.