(74 Misc. Rep. 170.)

## In re BARNES.

(Supreme Court, Appellate Division, Third Department. November 29, 1911.)

CONSTITUTIONAL LAW (§ 273*)—DUE PROCESS OF LAW—WITNESS—REFUSAL TO ANSWER.

In view of Judiciary Law (Consol. Laws 1909, c. 30) §§ 751, 755, 757, providing that a criminal contempt, if committed in the presence of the court, may be summarily punished, and otherwise that the offender must have notice, and that a person cannot be punished for civil contempt until given an opportunity to be heard, Code Civ. Proc. § 856, providing that, if a person duly subpœnaed, refuses without reasonable cause to be examined or answer questions or produce books, then the judge of any court may, upon proof by affidavit of the facts, by a warrant commit the offender to jail, is unconstitutional because not giving the witness notice or an opportunity to be heard.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 739; Dec. Dig. § 273.*]

Betts, J., dissenting.

Appeal from Special Term, Albany County.

In the matter of the application to punish William Barnes, Jr., for contempt in not answering questions propounded by the Senate Committee, composed of Howard R. Bayne, chairman, and others. From an order of commitment made at Special Term, defendant appeals. Order reversed and motion for commitment denied.

The following is the opinion of Joseph A. Kellogg, J., at Special Term:

An order to show cause has been heretofore issued upon application made in behalf of a legislative committee directing William Barnes, Jr., to show cause why a warrant should not be issued to the sheriff of the county of Albany committing said Barnes to jail, there to remain until he produces before such committee certain books of the Albany Journal Company, a corporation having its office at Albany, which books he has refused to produce, and answers certain questions which he has refused to answer.

Section 856 of the Code of Civil Procedure, authorizing issuance of the warrant applied for, must be read in connection with preceding sections. Section 854 provides that when a committee of either house of the Legislature has been duly empowered by resolution to take testimony during a session thereof, or after the adjournment thereof, the attendance of a person or witness may be required by subpœna issued under the hand of the

chairman or a majority of the committee requiring the person to attend, and also, in a proper case, to bring with him a book or paper. Section 855 requires a person duly subpœnaed to obey the subpœna, and provides that, upon his failure so to do, he shall be liable for certain damages, and, upon proof by affidavit of the failure to attend, he may be apprehended under warrant and brought before the body before whom his attendance was required. Section 856 provides as follows: "If the person subpœnaed and attending or brought as prescribed in the last section before an officer or other person or a body refuses *without reasonable cause* to be examined, or to answer a legal and pertinent question, or to produce a book or paper which he was directed to bring by the terms of the subpœna, or to subscribe his disposition after it has been correctly reduced to writing, the person issuing the subpœna, if he is a judge of a court of record, or not of record, may forthwith, or, if he is not, then any judge of such court, may upon proof by affidavit of the facts by warrant commit the offender to jail, there to remain until he submits to do the act which he was so required to do or is discharged according to law."

The facts stated in the moving papers are not disputed by affidavit.

Among other things they show the following: On or about the 21st day of July, 1911, a concurrent resolution was regularly passed and adopted by the Senate and Assembly of the state of New York, which resolution is as follows:

"Whereas, it has been charged and there is reason to believe that grave abuses exist in the various departments of the county of Albany and of the city of Albany respectively; that said departments have been and are corrupt; that in said county of Albany and in said city of Albany the laws and municipal ordinances for the suppression of crime and for the securing of peace, security, order and morality are not strictly enforced by the departments to which the enforcement thereof is intrusted; that said laws and ordinances when enforced are enforced with partiality and favoritism; that money and political support are given or promised to public officials in said county and said city by the keepers or proprietors of gaming houses, disorderly houses, liquor saloons and other offenders against the law in exchange for immunity from punishment and other promises of favor; that said departments and offices of the county of Albany and the city of Albany have been and are conducted with the object of personal gain to officials in said departments and offices; that there have been misappropriations and dishonesty in said departments and offices; that said departments and offices have for corrupt purposes, exercised unfair methods and discriminations against the citizens of said county of Albany and said city of Albany; that said departments and offices have been and are conducted with extravagance and waste for the purpose of creating superfluous positions for political adherents; and that in all said departments of the county of Albany and city of Albany there are practices working contrary to public economy and efficiency; and

"Whereas, a strong public sentiment demands of this Senate an investigation of all the matters above and into all departments and offices of the county of Albany and the city of Albany for the purpose of remedying and preventing, by proper legislation, such abuses and corrupt practices; now therefore be it

"Resolved, that the President of the Senate be and he hereby is authorized to appoint five Senators who shall be a special committee of this Senate with power to investigate all and singular the aforesaid matters and charges and all and singular the various offices and departments connected with the county of Albany and the city of Albany respectively; that said committee have full power to prosecute its inquiries in any and every direction in its judgment necessary and proper to enable it to obtain and report the information required by this resolution; that said committee report to the Senate upon its investigation with such recommendations as in its judgment the public interests require; that said committee be authorized to sit and hold its sessions in a place to be selected by it in the capitol in the city of Albany; that the committee be authorized and empowered to subpœna and compel attendance of witnesses, including public officers and employés, and the production of books and papers, including public records and documents, to administer

oaths, fake proof and testimony, employ counsel and examiners, stenographers and other necessary assistance as in their judgment are required; and have all the powers usual and incident to legislative committees, including the adoption of rules for the conduct of its proceedings, and be it further

"Resolved, that the said committee shall conclude its investigation in time to report to the Senate on or before the first Tuesday of January, 1912, so that proper legislation may be enacted to suppress said evils; and be it further

"Resolved, that it is the intention of this Senate that it is contrary to public policy and to the interest of good order and efficient investigation that any person giving evidence before said committee tending to show that he has been a party to the practices above mentioned, should be indicted or prosecuted upon the evidence so given, or upon the admission as made by him, and be it further

"Resolved, that the actual and necessary expenses of the committee in carrying out the provisions of this resolution, not exceeding the sum of $25,000, to be paid from the moneys appropriated for the contingent expenses of the Legislature by the Treasurer on the warrant of the Comptroller and the certificate of the chairman of the committee."

In the course of the investigation entered upon by the committee, pursuant to said resolution, William Barnes, Jr., who had been sworn as a witness before said committee, refused to answer certain questions propounded to him and which he was directed to answer by the committee, and failed to produce certain books of the Journal Company after having been subpœnaed to produce the same. An order was granted requiring the said witness to show cause why a warrant should not issue under section 856 of the Code of Civil Procedure. Upon the return of the order, an adjournment was had at the request of counsel for the witness, and upon the adjournment the matter was submitted upon oral argument and written briefs of the respective counsel. I have been most materially assisted by this argument, both oral and written, and by the exhaustive research of the very learned counsel engaged therein. In view of the substantial aid which has been thus courteously extended by counsel, it is but fair that the various questions submitted should be carefully considered, and the reasons for arriving at the result hereinafter indicated stated somewhat at length.

It is earnestly contended on behalf of the witness that the section in question is unconstitutional, in that it is in violation of the provisions of the federal and state Constitutions protecting citizens from any threatened deprivation of liberty without due process of law. It is contended that, inasmuch as the section does not in terms require notice to be given prior to the issuance of the warrant, a citizen may be punished in this summary manner without having an opportunity to be heard or having a day in court, and it is further argued that such defect asserted to exist in the statute is not remedied in the case at bar for the reason that the witness here as a matter of fact has had actual notice.

It is quite clear that if, in order to constitute "due process of law" in this class of cases, notice prior to issuing the warrant must be given, and such notice is not required either expressly or impliedly by the statute itself or other provision of law applicable thereto, a defect exists which is not cured by any actual notice which may have been given in this particular case. The principle was laid down by Judge Earl in Stuart v. Palmer, 74 N. Y. 183, 188, 30 Am. Rep. 289, that "the constitutional validity of the law is to be tested, not by what has been done under it, but by what may, by its authority, be done." Embarrassment arises at the outset of the consideration of this question, for the reason that the Appellate Divisions in the First and Second Departments seem to be at variance in their decisions in regard thereto. In Matter of Grout, 105 App. Div. 98, 93 N. Y. Supp. 711, the Appellate Division of the Second Department, after considering in detail various questions propounded to a witness by the comptroller of the city of New York, examining under a provision of the charter of that city, and holding that many of such questions were not pertinent or legal, advances to the broad proposition that the section is unconstitutional, because it does not provide that notice must be given to the witness of the application for the

warrant of commitment before it is issued. Several years before the General Term in the First Department had held to the contrary. In re McAdam, 54 Hun, 637, 7 N. Y. Supp. 454. Justice Van Brunt, delivering the opinion of the court, stated: "What is 'due process of law' has not been clearly defined; but the practice of summary commitments has prevailed ever since the Revised Statutes were adopted, and long before the adoption of the Constitution to which reference has been made. Such a procedure in the case of a witness has been recognized for a sufficient length of time to bring it within the category of 'due process of law.'"

The authority 'of this case was recognized by the Appellate Division in the same department in Press Publishing Co. v. Associated Press, 41 App. Div. 493, 58 N. Y. Supp. 708. The decision in Re McAdam is upon the broad ground that in a proceeding to punish a contumacious witness previous notice to such witness is not requisite under procedure well established at the time the Constitutions were adopted, and that "due process of law" as, at that time understood, did not in such cases contemplate that the trial or hearing at which the testimony of the witness was desired should be suspended in order that a collateral trial or hearing might be had as to the right of the witness to refuse to answer. It is urged in behalf of this decision that the proceeding was always summary and expeditious, and necessarily so, in order to prevent delay in the administration of justice, and that such practice at that time thoroughly recognized was in the minds of the framers of the respective Constitutions "due process of law" in cases of contumacy. If otherwise doubt existed as to which department should be followed in this apparent conflict of decisions, a line of authorities in the Court of Appeals under a somewhat similar provision of statute requires an adherence to the principle laid down in the First Department.

Section 756 of the judiciary law (Consol. Laws 1909, c. 30), which was formerly section 2268 of the Code of Civil Procedure, expressly provides for an issuance of a warrant without notice in certain classes of refusals to obey orders of the court upon proof thereof by affidavit. This is another class of cases of contumacy beyond the view of the court in which it is expressly provided that witnesses may be confined until compliance by warrant issued without notice and upon proof by affidavit. The validity of this section has been recognized by the court of last resort, and has been adhered to by the subordinate tribunals without exception, so far as I have been able to find. Clark v. Bininger, 75 N. Y. 344, 350; People ex rel. Crouse v. Cowles, 3 Abb. Dec. 507. The succeeding section (section 757 of the judiciary law), formerly section 2269 of the Code of Civil Procedure, authorizes the court in its discretion to give notice to the alleged delinquent. Such provision, however, is open to the same criticism as is the section under consideration in the case at bar, in that it does not require notice to be given which, if the witness were entitled to as a constitutional right as here urged, must be required and provided for by law, and not rest within the discretion of the judge or court in order to preserve its constitutional validity. It may, perhaps, be further interesting to notice that the section of the Revised Statutes to which the Code section was the successor and which was in force when the Crouse Case was decided made no provision whatever as to whether or not notice should be given, and was substantially similar to the provision now contained in section 856. The express provision authorizing the issuing of the warrant of commitment without notice was a modification contained in the Code of Civil Procedure, which, taken in connection with the following section, substantially provides for the same procedure as the provisions of the Revised Statutes which has been the law for many years.

But, furthermore, it would seem from a careful reading of section 856 that notice was required by necessary implication. The section is operative only in case the witness refuses "without reasonable cause" to be examined, or to answer a legal and pertinent question, or to produce a book or paper. How could a judge of a court of record pass upon the question as to whether or not a witness had "reasonable cause," unless the witness were given an opportunity to be heard and to state his reason? Both his "cause" and his theory of the reasonableness thereof might be entirely lodged within the recesses of his own mind, and not be available either to the person seeking to

punish him for contumacy or to the judge who was asked to issue the warrant. The fact that the warrant can properly be issued only where the witness is "without reasonable cause" in his refusal seems from the very nature of the case to require that he be permitted to state his cause in order that the judge may judicially determine as to its reasonableness.

The same objection which is urged to this section is also applicable to section 4 of the legislative law (Consol. Laws 1909, c. 32), authorizing the Legislature itself to punish by imprisonment a neglect to attend or be examined as a witness before either house. or a committee thereof. This section does not, by its terms, provide for notice. It succeeded a substantially similar provision contained in 1 R. S. 154, § 13, the validity of which was upheld by the Court of Appeals in People ex rel. McDonald v. Keeler, 99 N. Y. 463, 2 N. E. 615, 52 Am. Rep. 49. A late decision has been made by Mr. Justice Putnam in the Matter of the Union Bank of Brooklyn, 132 N. Y. Supp. 905, upholding the constitutionality of the preceding section (855), part of the system provided for by this title of the Code for compelling. the attendance of witnesses. The constitutionality of this section was upheld by that learned justice, although it provides for no previous notice being given to the witness before he is brought by force before the court upon failure to answer a subpœna. It is urged that this decision is not applicable because section 855 does not authorize imprisonment, but merely the production of the witness before the court. It is certainly a deprivation of the liberty of a citizen to take him against his will to a session of a committee or a hearing before an official, which is similar in kind, even if less in degree, to the confinement provided until he answers a proper question or produces a paper in a proper ·case. Furthermore, the decision must, inferentially at least, uphold the constitutionality of section 856, because it would be very idle, indeed, to bring a witness before a committee, if, when seated in the witness chair, he could with impunity wholly refuse to answer questions or to produce any paper required. See, also, Eagan v. Lynch, 3 Civ. Proc. R. 236, 238.

The proposition is somewhat startling that there is no power under the law to compel a witness to answer any question or to produce any book or paper whatever before a board, committee, commission, or official authorized by law to make investigations or to take evidence. Such a construction would render powerless the Public Service Commission, the Superintendent of Banks, the Superintendent of Insurance, all other departments and officials authorized to make investigations, and all legislative investigating committees. During the many years which this statute has been upon the books, many important investigations have been conducted, many well-advised witnesses have attended, many eminent· counsel have been observant of the rights of such witnesses, and, until the decision in the ·Matter of Grout, the constitutionality of the act seems to have been conceded without question. A construction of the section which would require it to be held unconstitutional, thus depriving all public officials, boards, commissions and departments, and legislative committees of power to compel witnesses to give testimony or produce papers should not be had when a fair construction of the section both with regard to its wording and its purpose permit a construction which would uphold as constitutional this most necessary provision of law.

Being of the opinion, therefore, that the act is constitutional, inquiry must be made as to how far, if at all, the witness has rendered himself amenable to its provisions. It is alleged that he has failed to comply with the requirements of the statute in two particulars: (1) By failing to produce certain books of the Journal Company. (2) By refusing to answer certain questions. Before he can be properly committed for either of these alleged offenses, it must appear that the action was "without reasonable cause."

As to the failure to produce books of the Journal Company before passing upon the question of his right in any event to withhold such books from the inspection of the committee, it is necessary to pass upon the objection now raised by counsel that the subpœna duces tecum was not served five days prior to the hearing as required by section 867 of the Code of Civil Procedure. Under date of October 19, 1911, Mr. Barnes, as president of the Journal Company, had directed the secretary and treasurer, Mr. Lindsay, by

letter, to refuse to deliver the books of the company which he had been sub-poenaed to produce upon the ground as stated: "The turning over of our books to the counsel of the committee will reveal nothing regarding the transactions of this company with the city and county of Albany that is not a matter of public record, but it will expose all of our business which has no relation to public affairs. The committee must know that the ledgers of the company contain the names of all those who do business with it, the amount paid by them for advertising and other business, and that, if these books pass out of our possession, the records might easily be copied and placed in the hands of our competitors. The mercantile business of the company is not a public affair, 'and concerns only the stockholders of this company."

At the hearing held October 25th Mr. Barnes stated that the letter set forth perfectly his position in regard to the matter, and declined to produce the books, and a subpoena was issued which was served upon him on that date, returnable the next morning at 10:30 o'clock. On the return of the sub-poena, being asked as to whether he would produce the books, he replied, "I have instructed Mr. Lindsay not to produce them, and, of course, I would also not produce them except on the order of 'the court." And, again upon being directed to produce them, replied, "I decline except by the order of the court, on the ground that the committee has no jurisdiction." The conten-tion made by the witness was quite plain and was very broad, and he did not rest upon any technical ground of lack of sufficient notice. He, in fact, invited this proceeding which was afterward taken to judicially determine his duty and obligations in the matter. Although his counsel has well urged and has sustained his argument by the citation of cases, this proceeding is stricti juris and all preliminary steps must be strictly pursued, yet, in this situation as in any other, a party may waive a provision as to length of no-tice or any other irregularity, and cannot thereafter urge such irregularity as a bar to the consideration of the matter upon its merits. People ex rel. McLaughlin v. Bd. of Police Com'rs of Yonkers, 174 N. Y. 450, 456, 67 N. E. 78, 95 Am. St. Rep. 596, and cases cited on latter page; Ryan v. City of New York, 177 N. Y. 271, 279, 69 N. E. 599; Grady v. City of New York, 182 N. Y. 18, 74 N. E. 488. An implied waiver arises from an omission to object when the occasion gives proper opportunity. Matter of N. Y., W. S. & B. R. Co. v. Hart, 35 Hun, 575, and cases cited on page 579; Matter of McLean, 138 N. Y. 158, 33 N. E. 821, 20 L. R. A. 389; Brown v. Otis, 98 App. Div. 554, 558, 90 N. Y. Supp. 250, and cases cited; Matter of Baker, 173 N. Y. 249, 253, 65 N. E. 1100. The failure, therefore, to give five days' notice cannot now properly be urged as a ground for the denial of the relief sought for, as it was an irregularity which was clearly waived by the position taken by the witness at the hearing.

This conclusion, therefore, makes it necessary to determine whether the witness was justified in refusing to produce the books called for by the subpoena upon the ground that they were the private books of the Journal Company, and being such their production could not be compelled upon this inquiry before this committee.

It is unnecessary to consider cases cited touching upon the right of an individual to refuse to produce his books and papers which disclose his pri-vate business. The right to withhold documents of this kind has been as-serted in cases where their production might incriminate the witness refus-ing to produce. No such privilege has been asserted here either upon the hearing before the committee or in the argument had upon this application; and, in fact, it should be said in fairness to the witness that any purpose on his part to invoke this privilege was on the former occasion expressly dis-avowed. As to whether, in any event, a citizen would have a right to with-hold his own books and papers upon the theory that they affected his private business, when, by such production it is not claimed that any incriminating evidence would be made available to prosecutors, it is not necessary in the light of authority to determine. The consideration of such a question here would be purely academic, not being involved in the controversy. Suffice it to say in passing that much of the evidence required to be given upon trials and hearings is of a nature which affects the private business of the witness, and may be to his disadvantage to disclose. As to the books and papers of

132 N.Y.S.—58

corporation, however, the rule is very different. These artificial persons created by the state are at all times subject to its visitation and inquiry, and their books and papers subject to examination under proper order issued therefor.

It is unnecessary upon this branch of the discussion to do more than quote the language of Mr. Justice Hughes in delivering the opinion of the Supreme Court of the United States in the case of Wilson v. United States, 221 U. S. 361, 31 Sup. Ct. 538, 55 L. Ed. 771, decided in April of the current year. After referring to the decision in Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652, and other decisions, that learned jurist proceeds as follows:

"What, then, is the status of the books and papers of a corporation which has not been created as a mere instrumentality of government, but has been formed pursuant to voluntary agreement, and hence is called a private corporation? They are not public records in the sense that they relate to public transactions, or, in the absence of particular requirements, are open to general inspection or must be kept or filed in a special manner. They have reference to business transacted for the benefit of the group of individuals whose association has the advantage of corporate organization. But the corporate form of a business activity, with its chartered privileges, raises a distinction when the authority of government demands the examination of books. That demand, expressed in lawful process, confining its requirements within the limits which reason imposes in the circumstances of the case, the corporation has no privilege to refuse. It cannot resist production upon the ground of self-crimination. Although the object of the inquiry may be to detect the abuses it has committed, to discover its violations of law and to inflict punishment by forfeiture of franchises or otherwise, it must submit its books and papers to duly constituted authority when demand is suitably made. This is involved in the reservation of the visitorial power of the state, and in the authority of the national government where the corporate activities are in the domain subject to the powers of Congress.

"This view, and the reasons which support it, have so recently been stated by this court in the case of Hale v. Henkel, supra, that it is unnecessary to do more than to refer to what was there said. Pages 74, 75 [of 201 U. S., page 379 of 26 Sup. Ct. (50 L. Ed. 652)].

"Conceding that the witness was an officer of the corporation under investigation, and that he was entitled to assert the rights of the corporation with respect to the production of its books and papers, we are of the opinion that there is a clear distinction in this particular between an individual and a corporation, and that the latter has no right to refuse to submit its books and papers for an examination at the suit of the state. The individual may stand upon his constitutional rights as a citizen. He is entitled to carry on his private business in his own way. His power to contract is limited. He owes no duty to the state or to his neighbors to divulge his business or to open his doors to an investigation, so far as it may tend to criminate him. He owes no such duty to the state, since he received nothing therefrom, beyond the protection of his life and property. His rights are such as existed by the law of the land long antecedent to the organization of the state, and can only be taken from him by due process of law, and in accordance with the Constitution. Among his rights are a refusal to incriminate himself, and the immunity of himself and his property from arrest or seizure, except under a warrant of the law. He owes nothing to the public so long as he does not trespass upon their rights.

"Upon the other hand, the corporation is a creature of the state. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the state and the limitations of its charter. Its powers are limited by law. It can make no contract not authorized by its charter. Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation. There is a reserved right in the Legislature to investigate its contracts and find out whether it has exceeded its powers. It would be a strange anomaly to hold that a state, having chartered a corporation to make use of certain franchises, could not in the exercise of its sovereignty

inquire how these franchises had been employed, and whether they had been abused, and demand the production of the corporate books and papers for that purpose. The defense amounts to this: ·That an officer of a corporation, which is charged with a criminal violation of the statute, may plead the criminality of such corporation as a refusal to produce its books. To state this proposition is to answer it. While an individual may lawfully refuse to answer incriminating questions unless protected by an immunity statute, it does not follow that a corporation, vested with special privileges and franchises, may refuse to show its hand when charged with an abuse of such privileges.

"* * * Being subject to this dual sovereignty, the general government possesses the same right to see that its own laws are respected as the state would have with respect to the special franchises vested in it by the laws of the state. The powers of the general government in this particular in the vindication of its own laws are the same as if the corporation had been created by an act of Congress. It is not intended to intimate, however, that it has a general visitorial power over state corporations. See, also, Consolidated Rendering Co. v. Vermont, 207 U. S. 541 [28 Sup. Ct. 178, 52 L. Ed. 327]; Hammond Packing Co. v. Arkansas, 212 U. S. 322, pages 348, 349 [29 Sup. Ct. 370, 53 L. Ed. 530].

"The appellant held the corporate books subject to the corporate duty. If the corporation were guilty of misconduct, he could not withhold its books to save it; and, if he were implicated in the violations of law, he could not withhold the books to protect himself from the effect of their disclosures. The reserved power of visitation would seriously be embarrassed, if not wholly defeated in its effective exercise, if guilty officers could refuse inspection of the records and papers of the corporation. No personal privilege to which they are entitled requires such a conclusion. It would not be a recognition, but an unjustifiable extension, of the personal rights they enjoy. They may decline to utter upon the witness stand a single self-criminating word. They may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers. But the visitorial power which exists with respect to the corporation of necessity reaches the corporate books without regard to the conduct of the custodian.

"Nor is it an answer to say that in the present case the inquiry before the grand jury was not directed.against the corporation itself. The appellant had no greater right to withhold the books by reason of the fact that the corporation was not charged with criminal abuses. · That, if the corporation had been so charged, he would have been compelled to submit the books to inspection, despite the consequences to himself, sufficiently shows the absence of any basis for a claim on his part of personal privilege as to them. It could not depend upon the question whether or not another was accused.· The only question was whether as against the corporation the books were lawfully required in the administration of justice. When the appellant became president of the corporation, and as such held and used its books for the transaction of its business committed to his charge, he was at all times subject to its direction, and the books continuously remained under its control. If another took his place, his custody would yield. He could assert no personal right to retain the corporate books against any demand of government which the corporation was bound to recognize." Pages 382–385 of 221 U. S., pages 545, 546 of 31 Sup. Ct. (55 L.·Ed. 771).

The language of the learned justice, ripe in his experience in the rules of jurisprudence maintained in our own state, speaking for that high court so, entirely covers this question that it would be presumptuous, indeed, to attempt in any respect to add thereto. The power of the Legislature or a committee of either of its houses acting under its authority to compel the production of the books and papers of a corporation cannot since this decision be seriously questioned.

It is, however, urged by the counsel for the witness that section 854 must, in this connection, be read with section 856, and that the former section which limits the right to compel the production by a witness of a book or

paper to "a proper case" is here applicable. This contention, I believe, to be entirely correct. Matter of Foster, 139 App. Div. 769, 124 N. Y. Supp. 667; Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377; Harriman v. Interstate Commerce Commission, 211 U. S. 407, 29 Sup. Ct. 115, 53 L. Ed. 253.

A determination of the question as to whether this is "a proper case" involves the consideration necessarily of the purposes and powers of the committee and the relation which the Journal Company bore to its proper plan and scope, and as to how far, if at all, an examination of the books of such company would be of value in the exercise of its powers and the pursuit of its purposes. The resolution creating the committee was very broad. It authorizes an extensive examination into the various departments of the county and city of Albany for the purpose of making such recommendations to the Senate, "as in its judgment the public interests require." It was developed upon the hearing that the Journal Company issued a newspaper in the city of Albany, known as the "Albany Evening Journal." The Argus Company had been awarded a contract, after apparent competitive bidding, to print the proceedings of the common council of the city of Albany, and as part of these proceedings they printed reports of the various city offices and departments. These reports were kept in type, and from time to time various city officials ordered from the Journal Company, which had not printed the proceedings, copies of these reports. The Argus Company furnished them to the Journal Company and the Journal Company received 25 per cent. of the cost price, without doing any portion of the printing or publication, or performing any service whatever except turning over the order. The reports were in fact printed from the type which had been set up at the time of their publication as a portion of the common council proceedings. The charter of the city of Albany requires that all material furnished in excess of $250 should be awarded by contract to the lowest bidder. When supplies were ordered in excess of this sum, the order was divided so as to render upon the face of things, at least, competitive bidding unnecessary. In addition to this, certain blank books, maps, and other supplies were ordered from the Journal Company. That company itself had not the facilities either to print the reports of the city offices, or to compile the blank books or to print the maps, but for some reason these things were ordered of this corporation which it immediately reordered from the Argus Company and obtained 25 per cent. of the prices paid. In addition to this, it appears that from this very contract for the printing of the minutes of the common council, which presumably was awarded to the lowest bidder after fair competitive bidding, the Argus Company paid directly to the Journal Company 15 per cent. of the amount received from the city. It thus appears that the Journal Company was obtaining a percentage upon supplies furnished to the city which it could not itself produce, and was receiving such percentage even upon supplies that were furnished under the forms of law in regard to competitive bidding, which had, upon the face of things, been complied with, but which one of the witnesses characterized, and perhaps properly so, as a "joke." Disbursements for public printing raised by taxation so liberal as to permit a corporation to withhold 25 per cent. of the entire price without performing any work or rendering any service whatever, and still leave a profit to the actual printer, are not only a proper subject of inquiry in an investigation of this nature, but such inquiry would seem to be imperatively demanded. This is something more than "private business." By many, at least, it would be considered a matter of grave public concern.

A subpoena substantially similar to the one which had previously been served upon Mr. Lindsay, the secretary and treasurer of the Journal Company, requesting him to produce the books of the company, was served upon Mr. Barnes, the president of the company. It required the production of "all ledgers and books of original entry from which the items are posted into the ledger, showing the business of the Journal Company with the various departments of the city and county of Albany, and with persons and corporations transacting business with said city and county for the past ten years." It would seem to be at least proper, when the facts had developed the existence of the practice indicated, to pursue still further the

inquiry in order to ascertain as to how far this percentage had been levied by the Journal Company upon supplies furnished to the city or county which it itself did not produce. The offer of the company to submit a statement from its books showing the dealings with the city and county could not cover the case. In instances similar to that of the Argus Company, where 15 per cent. of the price received for printing the minutes of the common council was paid direct to the Journal Company by the Argus Company, no entry would appear upon any account with any city or county official or department. In such instances it would be most advantageous not only to have available the books so far as they affected transactions with the city and county officials themselves, but also so far as they affected transactions with other persons who were selling supplies to the city who may, or may not, have paid to the Journal Company a percentage such as was paid by the Argus Company. Not only might this system extend to the cases of those who furnished supplies, but it might extend still further to cases of those who became indebted to the city. The same favor which the Argus Company invoked and for which it paid so liberally may have been appreciated by others engaged in similar pursuits. It may have been sought by those anxious not only to obtain high prices for goods furnished, but also by others anxious to settle for low prices their obligations to the city.

It was therefore most clearly a proper case for examination of the books of this corporation so far as they showed transactions with persons and corporations transacting business with the city and county of Albany. It clearly appears that the company was engaged in a line of business directly within the purview of the powers of the committee, and, inasmuch as the books of the corporation were subject to inspection under the decision in the Wilson Case, and this was a proper case for the production of such books before the committee, the subpoena was properly issued and the books should have been produced. Whereas it is true that an investigation into the details of the transactions might disclose violations of existing law, thus imposing a duty upon the officials of the county of enforcing the provisions of such existing law, the circumstances disclosed might also have indicated to the committee, and it might, after an investigation which fully disclosed the methods pursued, have recommended to the Legislature, pursuant to the resolution creating the committee, a line of proposed legislation creating new provisions applicable to the situation, or making existing provisions more drastic or more readily enforceable. A warrant is here also applied for because of the refusal of the witness to answer certain questions which were put to him. Many questions were asked during the course of his examination which the witness refused to answer.

A warrant for his commitment is applied for to imprison him until he answers 23 of these questions selected out of a much larger number. These questions he should only be compelled to answer if in the definition of the section they are "legal and pertinent," and if, also, his refusal to answer "without reasonable cause." The first two of these questions were as follows:

"Q. Well, how many shares of stock do you own in it (referring to the Albany Journal Company)?"

"Q. How many shares of stock did you own in it (referring to the Albany Journal Company)?"

The witness in the course of the controversy which arose in relation to these questions stated that he owned a majority of the stock of the Journal Company.

It is difficult to see why it was necessary to pursue the inquiry further.. the theory of counsel for the committee was that inasmuch as the witness was the "leader" of his party in the county and city, and the representative upon the state committee of the congressional district in which the county was situated, he therefore, in a measure, controlled, or at least influenced,. the action of the county and city officials who were members of his party and elected upon its ticket, and that the details of his business relations with this company should be thoroughly gone into in order that appropriate and sufficient legislation might be recommended to govern cases of this character where a corporation controlled by a dominant political leader was obtaining:

money from the public treasury for services not rendered by it. The full purpose of the investigation along this line, so far as Mr. Barnes is concerned, was fully met when it appeared from the evidence that he owned a majority of the stock of this company. Under authorities which have been previously referred to, when the investigation touches upon the rights of a private citizen, the rule is very different from the one permitting a full and complete investigation of the affairs of a corporation. The only conceivable aspect in which the exact stock ownership of Mr. Barnes could be material was upon the theory that, having located the exact number of shares owned by him, the committee could then proceed to locate the ownership of the remaining shares, in order to be advised as to who else had benefited by the transactions with the city which have been referred to; but the best evidence along this line would have been the stock book of the company, the production of which could have been compelled by subpœna, and, until that procedure had been attempted and found futile, the inquiries were not proper, and the witness should not be compelled to answer.

The next three questions are as follows:

"Q. I will ask you this question, during the ordinary business days of the year, do you direct the editorial policy of the Albany Journal?"

"Q. I ask you, do you control the business methods of the Journal?"

"Q. As the majority owner of the stock of the Journal Company, do you control the business methods of that corporation?"

The witness had stated that he was responsible for the editorial policy of the paper. As owner of a majority of the stock of the corporation publishing the paper he necessarily in one sense controlled its policy. This being the legal result of his stock ownership and he assuming the responsibility for what had appeared in the paper, I think these questions were neither legal nor pertinent to the inquiry.

The next question submitted for consideration is: "Q. Do you know any reason why the Journal Company should get this 15 per cent. we have been referring to (referring to the 15 per cent. paid by the Argus Company for materials furnished after contract had been awarded upon competitive bidding which has been previously considered)?"

As stated by the chairman of the committee, the witness had repeatedly stated that he knew nothing about this 15 per cent., and any inquiry which required him to state a reason for a condition as to which he had no knowledge is not legal nor pertinent.

The next four questions are as follows:

"Q. Do you know any reason why the books of the Journal should not be presented before this committee?"

"Q. Have you instructed the business manager of the Journal to refuse to let these books be seen before this committee?"

"Q. Have you any reason or objection to this committee inspecting your books in order to determine whether any other contractor who does business with the city pays a percentage to the Journal?"

"Q. Mr. Barnes, will you kindly instruct the members of your corporation to produce the books here, please, to be inspected by the committee?"

These touched upon the willingness of the witness to voluntarily produce before the committee the books of the Journal Company. The proper method of securing the production of the books was by subpœna, which was afterwards issued. These questions are not pertinent and proper, and the witness cannot be compelled to answer them.

The next question submitted is: "Q. Do you know whether or not Mr. Anthony Brady is the third largest stockholder of the Albany Journal?"

As to this question the stock book of the company is primarily the best evidence, and this inquiry should not be pursued until it is developed that the process of law available for the production of such stock book is shown to be insufficient to elicit the information required.

The next question is: "Q. In view of the fact that the Lyon Company has received from the county this amount of printing without any bid being put in, are you not willing to tell us how much you paid for your stock in the Lyon Company?" This question was answered by the witness when he stated that he was not willing to do so.

Up to this point there was no mistake made by the witness in refusing to answer the questions. There is no sufficient theory upon which it can be found that they were legal and pertinent. It can very properly be urged that an investigation of this nature must be pursued along indirect lines, and that the purposes of the examiner cannot be disclosed without in many cases thwarting the object of the examination and putting the witness on his guard; but before the witness can be punished for refusal to answer it would seem to be a necessary rule that, before the warrant should issue, the judge to whom the application is made must be able to thoroughly satisfy himself that the inquiry may lead to some result within the scope of the powers of the committee. In that view, the questions considered were not within the limitations of the section, and the witness should not be compelled to answer such inquiries put to him.

The next question opens up another line of inquiry: "Q. Mr. Barnes, you got your stock in 1901, is not that true (the inquiry referring to the stock of the Lyon Company)?"

As the stock book of the company may not show when he actually acquired ownership, but only when he had it transferred upon the books of the company, it was proper to inquire of him the date of the acquisition if it had any pertinency in the investigation. This is one of a series of inquiries relative to the Lyon Company which should be considered with others along the same line, although not presented consecutively.

The other questions were:

"Q. Did you pay anything for your stock in the Lyon Company?"

"Q. Did you talk with Mr. Lyon about the consideration that you paid for your stock at the time that you saw him?"

"Q. Did you pay for it?"

"Q. Did you pay anything for it (a repetition of the second question of this class)?"

"Q. Was it given to you?"

It appears from the papers that Mr. Barnes was the owner of 750 shares of the stock of the J. B. Lyon Company out of a total capitalization of 3,000 shares. This company had furnished the county of Albany printing during the past 10 years to the amount of approximately $100,000 without public bidding. The political party with which Mr. Barnes was affiliated was the dominant political party of the county during this time, and of this party Mr. Barnes stated that he was a "leader," defining the term to mean "a man whose advice is taken quite largely, pretty largely, by the men of the political party with whom he is associated." He was also during that time a member of the state committee of his party representing the congressional district of which the county was a part. The line of inquiry attempted to be opened up in these questions was very apparent. Investigation was being had as to whether a person in this position had acquired a substantial stockholding interest in a company which furnished printing to a large amount to the political subdivision in which he was a figure of power without any adequate compensation therefor; and whether this species of patronage had been given out to a company in return for an ownership or interest given to the political leader as a portion at least of the consideration to be paid for the acquisition of the stock by him. Here the committee was directly within its powers and in the discharge of its duty. If a citizen has the political power to control the distribution of the people's money and thus so controlled it to his own advantage, it is a matter which might be very well recommended by this committee to the Senate as a matter worthy of consideration, so that, if possible, legislation may be enacted to prevent a practice which will, at least, have a tendency to corruption, even though the dominant figure actually holds no office himself, but merely controls others who have it in their power to award to his companies, without bidding, lucrative public contracts and business.

It is a well-known fact of which judicial notice may very properly be taken that under latter day methods of political organization the actual rulers of many political subdivisions are not those who are nominally holding office, but those whose control over the political organization to which the actual officers belong made their election or appointment possible. In

many localities officers hold their position by power of so-called leaders. These officers, in turn, have to do with the disposition of the public patronage, the awarding of the public business, the purchasing of the public supplies, and the disposition of the public property. If, with impunity, a dominant factor can so exercise his power as to obtain substantial pecuniary benefit from the public business by urging the officers over whom he has influence through his power of selection to award that public business to corporations in which he has an interest, and especially when that business is so lucrative that a very substantial portion of the profits can be surrendered without adequate consideration to a political leader in order to secure the profits which accrue from the remainder, it is certainly a matter which not only permits, but demands, investigation, in order that, if possible, it may be corrected. The witness in question held office in a political party as defined by the election law (Consol. Laws 1909, c. 17). This party through its officers had public duties to perform and certain public privileges to exercise in the selection of officials. He was in a sense a quasi public officer.

It may very properly be urged that the powers enjoyed by such a one should not be exerted to his own pecuniary advantage to the detriment of the taxpaying public. From the foregoing it is not to be understood to be determined here that any of these conditions has as yet been actually and satisfactorily proven upon this investigation, but the line of inquiry had been opened, and it pointed to a condition which was properly within the line of investigation, and the committee should not be thwarted in its very plain duty by the refusal of any person to answer questions involving a corporation which had been paid a very substantial sum of public money by the mere assertion that it was his "private business." These questions were both legal and pertinent, and inasmuch as the witness has not yet put himself upon his privilege of refusing to answer upon the ground that by answering he may be furnishing evidence in aid of a criminal proceeding against himself, and does not urge that as a reason for refusing, his declination to answer is without reasonable cause.

Coupled with these inquiries were two others as follows:

"Q. Were you the owner of the Albany Morning Express at or about the time it was combined with the Knickerbocker Express?"

"Q. The Knickerbocker Press?"

It is urged that these questions have some pertinency in connection with the acquisition of the stock of the Lyon Company, because it is charged that at about the time Mr. Barnes acquired his stockholding interest in the Lyon Company the owner of the Knickerbocker Express had a contract for state printing which was immediately assigned to the Lyon Company. The pertinency of these questions is not sufficiently clear to authorize the issuance of a warrant of commitment for failure to respond to the inquiries. If they touch upon the question of ownership of stock in the Lyon Company, the facts could very probably be developed in answer to the inquiries last above considered, and, if in pursuing that line of inquiry the materiality of this subject should become more evident, it might then be permissible to pursue the inquiry along this line.

The next question so called is as follows: "Q. Mr. Barnes, the committee directs you to produce the books?" This is not a question, but a direction of the committee. It had not the power to direct him to produce the books except by issuance of subpœna.

The remaining questions are as follows:

"Q. You knew, did you not, that, as the political leader of this county, it would be to the manifest advantage of each political officer to be in your favor, did you not?"

"Q. And you know that, being desirous of obtaining your kindly feeling, that it would be a temptation on the part of these officers to bring the printing to the Albany Journal, did you not?"

The witness could not have known these things. They are merely matters of opinion with him as they necessarily must be with the committee. He should not be compelled to answer. As a summary of the conclusions in regard to the detail of the questions which the witness declined to answer, which are complained of here, the following result is arrived at:

These five questions only were pertinent, and should have been answered:
"(1) Mr. Barnes, you got your stock (referring to the stock of the Lyon Company) in 1901, is not that true?
"(2) Did you pay anything for your stock in the Lyon Company?
"(3) Did you talk to Mr. Lyon about the consideration that you paid for your stock at the time that you saw him?
"(4) Did you pay anything for it?
"(5) Was it given to you?"

There is some confusion in the practice as to the necessity of issuing any order in a case of this kind. The better practice would seem to be that an order should issue.

An order will be granted directing that a warrant be issued to the sheriff of Albany county commanding him to apprehend Mr. Barnes and commit him to the jail of Albany county until he shall answer the five questions hereinbefore stated, and until he shall have produced before the legislative committee the books required by the subpœna, or until he is discharged according to law.

Inasmuch, however, as upon the hearing the position of the witness was a difficult one, and he was not entitled to be represented and was not represented by counsel, except in so far as he may have been previously advised in a general way as to his rights, and in view of the fact that he expressly stated that he desired the pertinency of the debatable questions and his duty as to the production of the books of the Journal Company judicially determined, such warrant should not issue until he has an opportunity to perform the acts indicated or to take such other course as he may be advised.

I think eight days should be sufficient for that purpose, and the warrant will not issue until the expiration of that length of time from the service of a copy of the order upon the witness.

Argued before SMITH, P. J., and KELLOGG, SEWELL, HOUGHTON, and BETTS, JJ.

William M. Ivins and Edgar T. Brackett, for appellant.

James W. Osborne and Arthur T. Warner, for respondent.

PER CURIAM. The only authority upon the subject holds that section 856 of the Code of Civil Procedure contemplates no notice to the alleged offender. We do not feel at liberty to overrule those cases. In re McAdam, 54 Hun, 637, 7 N. Y. Supp. 454 (General Term, First Department, 1889); Matter of Grout, 105 App. Div. 98, 93 N. Y. Supp. 711 (Second Department, 1905). The question therefore is whether this section, so construed, violates the appellant's constitutional rights. In the case of criminal contempts it is provided by section 751 of the judiciary law that, if committed in the presence of the court, the offense may be punished summarily; otherwise the alleged offender must have notice and time to prepare his defense. In the so-called civil contempts (Judiciary Law, §§ 755, 757), a person cannot be punished for contempt until after he is brought before the court by warrant or an order to show cause and given an opportunity to be heard. The McAdam Case, above cited, holds that, although no notice is required, the section is valid. The Grout Case holds that the section is unconstitutional, in that the defendant has had no opportunity to be heard. Adopting the construction placed upon the section by the above authorities that no notice is contemplated, we are constrained to follow the Grout Case, as the latest decision of a court of co-ordinate jurisdiction, that the statute is unconstitutional, and that the order should be reversed and the motion for commitment denied.

HOUGHTON, J., concurs in result in memorandum, and BETTS, J., dissents in brief memorandum, and votes for affirmance on opinion of Joseph A. Kellogg, J., in the court below.

HOUGHTON, J. (concurring). For the reasons pointed out by the learned court at Special Term and particularly because requirement for notice can properly be read into the law, I think section 856 of the Code of Civil Procedure is not in contravention of either the federal or state Constitutions. I do not think, however, that the questions propounded to Mr. Barnes with respect to his acquiring the J. B. Lyon stock and which he refused to answer were pertinent or material to the legitimate inquiries of the legislative committee, or that the necessity and propriety of producing the books of the Journal Company sufficiently appeared. On the 2d of September, 1911, the President of the Senate, pursuant to a concurrent resolution of the Legislature, appointed five senators as a special committee to investigate the city and county of Albany. The resolution authorizing such appointment recites, in substance, that it is reputed that the commission of crime is prevalent in the city and county of Albany, that prosecution therefor is lax, and that municipal laws and regulations are disregarded by the public officials, and that corruption amongst them exists, and that it is wise for the Legislature to investigate concerning the truth of such rumors to the end that remedial legislation may be suggested to cure such evils if any be found. The committee organized, engaged counsel, and began hearings at which various witnesses were sworn. As shown by the moving papers, it appears that a corporation known as the J. B. Lyon Company, engaged in the printing business, was organized about 1901 with a capital of $300,000, consisting of 3,000 shares of the par value of $100 each, and that at about the time of such organization Mr. Barnes, who was and is the majority owner and publisher of the Albany Evening Journal, a Republican newspaper, became the owner of 750 shares of the Lyon Company stock; that the Albany Evening Journal for a period of 12 years prior to the hearing had presented and been paid by the state upwards of $14,500 for the printing of Session Laws, for which it is alleged no services were rendered; that for several years upon competitive bidding the city of Albany had awarded to the Albany Argus, a Democratic newspaper, because it was the lowest bidder, printing contracts upon which the Argus Company voluntarily paid the Journal Company 15 per cent of its receipts, and that for several years various boards and departments of the city of Albany had split up their contracts with the Journal Company for printing and services into amounts less than $250 to avoid competitive bidding; and that the J. B. Lyon Company for a number of years had been paid large sums for county printing without public bidding at the instance of county officials and departments, all of which were Republican in politics. After these facts were claimed to have been established by other evidence, Mr. Barnes was called as a witness, and he testified that he was a

Republican and for some years had been the Republican leader in the city and county of Albany, defining his position of leader as one whose advice was in general accepted by members of his party; that for some years he had been the majority owner and manager of the Albany Evening Journal; that since its organization he had been and was now the owner of 750 shares of the J. B. Lyon Company. He was then asked how much he paid for those shares, whether they were given to him or not, and whether he had any talk with Mr. Lyon when he acquired them, which questions he refused to answer. A subpœna duces tecum was also served upon him to produce before the committee all ledgers and books of original entry showing the business of the Journal Company with the various departments of the city and county of Albany and with persons and corporations transacting business with said city and county for the past 10 years, and he refused to produce such books, but offered, however, to give to the committee true copies of all entries contained in such books for said period, relating to any business had by such company with the city and county of Albany, and the various departments and officers thereof.

It could not aid the committee in framing its report to the Legislature or in the recommendation of legislation to know in what manner Mr. Barnes acquired his stock in the J. B. Lyon Company. If there was any dereliction on his part in owning stock in that corporation, which personally I fail to appreciate, the fact that he owned a large amount was sufficient for the purposes of the committee. Whether he obtained it by purchase or gift, at a high price or at a low price, or with whom he talked about purchasing, is wholly immaterial so far as the jurisdiction of the committee is concerned. Being the owner of a comparatively large amount, he is conclusively presumed to be interested in the prosperity and welfare of the corporation. If the Lyon Company was favored by the officials and boards of the city and county of Albany and any inference is to be drawn that such favoritism was because of Mr. Barnes' ownership of stock therein, the committee already has knowledge that he is a large stockholder and is in possession of all the facts and can invoke all the presumptions from which it could draw any conclusion pertinent or otherwise to its inquiry. His interest in the prosperity of the corporation is as great whether the stock cost him much or little or nothing at all. There would have been no breach of the law in Mr. Lyon giving or in Mr. Barnes accepting a gift of the stock, nor in Mr. Lyon selling or in Mr. Barnes buying the stock. I do not understand that it is claimed that any public official has wrongfully given public business to the J. B. Lyon Company at the direct solicitation of Mr. Barnes, and only by inference is it asserted that such public business was given because he chanced to be a large stockholder. If such were the fact, it is the official who is thus derelict in his duty, and not the owner of the stock. Paternal legislation has not yet gone to the extent of prescribing how an individual shall make investments or what he shall pay for them, or to prevent him from lawfully accepting a gift of personal property if he so desires. The

questions, therefore, which the witness refused to answer were wholly immaterial, and not at all pertinent to any legislation which the committee could recommend, and he was justified in his refusal. A witness was held justified in refusing to answer questions far more pertinent to the inquiry then those at bar in Harriman v. Interstate Commerce Commission, 211 U. S. 407, 29 Sup. Ct. 115, 53 L. Ed. 253.

I recognize that there is a very wide difference between the right to compel the production of corporate books and those of an individual. Assuming, however, that because the books are those of the Journal Company, a corporation owing its life to the state itself, there exists a greater right to inspect than if they belonged to an individual, still there must be some reasonable cause shown why the production of the books even of a corporation is necessary before the court shall resort to the extreme remedy of imprisonment for refusal to produce them. The matter set forth in the moving affidavit respecting which the production of the books is claimed to be necessary to the investigating committee are the printing of the Session Laws done by the Journal Company amounting to $14,504.50, during a period of 12 years, paid for by the state after audit by the Comptroller of the State, the payment by the Argus Company to the Journal Company of 15 per cent. of the amount of its printing contracts with the city of Albany which were duly let to it because it was the lowest bidder, and the doing of printing by the Journal Company for the city and its officers without competitive bidding therefor.

I do not understand it to be claimed that the bills for printing of the Session Laws were in fact fraudulent, but it is presumably claimed that the printing was done from forms purchased of others, instead of the type being set up in the Journal office. This is the common practice throughout the state. The law requires the members of the two dominant political parties of the boards of supervisors of the various rural counties annually to designate a newspaper of each party to publish the Session Laws, and the price therefor is fixed by statute. These newspapers fully perform their contracts by printing the laws from forms or from sheets printed by others and inserting them in their own newspaper, and there has never been any question concerning their right to compensation if so published. The fact that the Argus Company gave to the Journal Company 15 per cent. of the amount of its contract price for the printing which it obtained by its lowest bid the committee already has knowledge of. The books of the Journal Company cannot add to the culpability of that act if it was culpable, or throw any light on the transaction. So, too, the committee already has proof before it, as the moving papers show, that the Journal Company entered into contracts with city officials for the doing of printing and the furnishing of materials without such contracts being obtained by competitive bidding, and by splitting up the same so no one would amount to more than the prohibited sum of $250. The books of the Journal Company cannot make these transactions any worse or any better. If there was any evasion or violation of the law, that fact is now before the commit-

tee. It is not claimed that the books would show that these contracts were in fact let by competitive bidding. The fact that they were not and that the law was violated is asserted to have been already proven before the committee.

Indeed, counsel for the committee very frankly states he does not claim that it needs any more light upon those facts set forth in his moving affidavit, but he says the committee desires to look at the books and find out whether some other infraction of the law has not been committed without being able to point out what that infraction is or to show any grounds that it probably exists. Mr. Barnes offered to give to the committee true sworn copies of all that the Journal Company's books show for the period desired respecting any dealings between the city and county or any officials connected therewith. This offer, however, was not satisfactory to the committee, presumably upon the ground last stated, that, if permitted to roam through the books and look at all private entries, it might be able to discover some person whose name appeared upon the books who had had some questionable dealings with public officials. This would be the exercise of an inquisitorial function far beyond the powers of the investigating committee, and the invasion of the meager rights even of a corporation. The only legitimate purpose of the investigation is to enable the committee to report some remedial legislation to correct evils which it may find to exist. It is not every evil which is subject to investigation and remedy by the Legislature. Breach of law and defective working of present municipal law embrace all the matters which the resolution creating the investigating committee properly covers, and all the committee could legitimately investigate. It is not claimed that Mr. Barnes committed any crime, and counsel for the committee freely disavows any such charge. The most that is insinuated is some vague, indefinite undue influence exercised by him through his political position. I cannot see how the answers to the questions propounded or an inspection of the books of the Journal Company would throw any light on any breach of law or show any defect in the working of the present municipal laws applicable to the city and county of Albany, or properly aid the committee in performing its legitimate functions.

For these reasons, I think the witness was justified in refusing to answer the questions and in declining to produce the books of the Journal Company; and therefore concur in a reversal of the order and denial of the motion.

BETTS, J. (dissenting). A committee appointed by concurrent resolution of the Legislature is investigating conditions prevailing in Albany with a view of suggesting remedial legislation that will improve conditions alleged to there exist. A witness, one William Barnes, Jr., subpœnaed to testify and produce certain books of the Journal Company, of which he is president, has refused to answer questions claimed to be pertinent, and also refused to produce said books. The matter is important because the judiciary is asked to hinder and prevent the legislative inquiry. The lower court, on suf-

ficient precedent, has it seems to me, as applied to the facts disclosed here, properly held that the questions should be answered and the books produced. This court is about to reverse on authority of a decision of the Appellate Division of the Second Department which decision was rendered on facts not at all analogous to the facts existing here. I dissent from that opinion and vote for affirmance of the order appealed from on the opinion of Justice Joseph A. Kellogg in the court below.